Argued October 30, affirmed November 27, 1917, rehearing granted
    January 15, argued on rehearing January 30, former opinion modi-
    fied April 16, 1918.

## In Re WATERS OF UMATILLA RIVER.*

(168 Pac. 922; 172 Pac. 97.)

**Waters and Watercourses—Appropriation—Extent.**

1.  An appropriation of water for irrigation attaches only to what
is reasonable and necessary for a beneficial purpose; and to the extent
that water is wasted or used extravagantly, appropriation is vitiated.

    [As to what constitutes appropriation of water, see note in 60
Am. St. Rep. 799.]

**Waters and Watercourses—Appropriation—Abandonment.**

2.  Under Section 6546, L. O. L., appropriation of water for irriga-
tion and domestic purposes is abandoned by failure to make use of
water conduit for a year; Section 6571 fixing the period of nonuser
at two years, being part of the act relating to taking of water for
developing mining and electric power.

**Waters and Watercourses—Appropriation—Notice.**

3.  The notice and map which Section 6528, L. O. L., requires an
appropriator of water for irrigation to file, mark the limit of the pro-
posed enterprise; and activities beyond the scope thereof require pro-
ceedings for a new appropriation.

**Waters and Watercourses—Appropriation by United States—Rights
    Acquired.**

4.  Compliance with procedure prescribed by Act Feb. 22, 1905
(Laws 1905, p. 401; L. O. L., § 6588), Section 2, for appropriation of
waters by the general government, vested the United States with all
the then unappropriated waters of a stream.

**Waters and Watercourses—Appropriations—Adjudication of Rights—
    Findings—Seepage and Evaporation.**

5.  The court in a proceeding under Section 6635 et seq., L. O. L.,
for adjudication of rights of the several water users on a stream, in
classifying lands according to nature of soil, and ascertaining the
amount of water sufficient for various classes of land, properly treat,
as incident to such finding of fact, the matter of seepage and evapo-
ration.

**Waters and Watercourses—Review—Determination of Water Rights.**

6.  The Supreme Court, the original jurisdiction of which is con-
fined by Article VII, Section 2, of the Constitution, to *mandamus, quo*

*Generally on the right to use or direct water for irrigation, see
note in 41 L. R. A. 741.

On the question of abandonment or loss of right of prior appropria-
tion of water, see note in 30 L. R. A. 265.

As to rights of prior appropriator of water generally, see note in
30 L. R. A. 665.                                        Reporter.

*warranto* and *habeas corpus,* and which acquires appellate jurisdiction only by service of notice of appeal, cannot on motion of a party to a proceeding for adjudication of rights of users of water on a stream, and who has not, as authorized by Section 6650, L. O. L., as amended by Laws of 1913, page 162, appealed from the decree, go into a new investigation involving consideration of testimony presented for the first time in the form of affidavits, to revise the decree as on an original proceeding to impeach it.

## ON REHEARING.

### Waters and Watercourses—Appropriation—Notice.

7. Section 6595, subdivision 7, L. O. L., providing that attempted appropriation of water shall not be avoided because of insufficiency of notice, applies only where there was a mistake, and not where the notice expressed the intention.

### Waters and Watercourses—Appropriation—Purpose—Evidence.

8. General testimony as to purposes when appropriation of waters was made, to irrigate all land that could be reached by extension of the ditch, must yield to specific testimony that there was then no intention to extend the ditches to certain lands.

### Waters and Watercourses—Appropriation—Use for Other Lands.

9. That waters appropriated with intention to irrigate certain lands may be used to irrigate other lands, there must have been a continuing intention to irrigate a well-defined acreage; and intention to irrigate the first lands being abandoned before intention to irrigate the others becomes fixed, the water right is lost.

### Waters and Watercourses — Appropriation by the United States—Rights Acquired.

10. Right of the United States, through compliance with Section 6588, L. O. L., to all the waters not then appropriated, is not affected by its lack of diligence in completing its project, or by the fact of all the waters not being required to irrigate the lands served by its ditches; these matters not being conditions of the statute.

### Waters and Watercourses—Water Companies—Priorities of Customers.

11. Priorities of persons supplied with water by a water company depend not on the dates of their contracts, but on the priority of use of water on the lands.

### Waters and Watercourses—Adjudication of Priorities—Water-masters.

12. Provision of the decree in proceeding for adjudication of the rights of the users of waters of a stream, that the specification of a definite amount of water per acre, in the findings, shall not be taken as granting that specific amount of water to any water user, but shall only be taken as a rule and guide for the water-master in the distribution of a maximum amount of water to any water user, is improper; the parties being entitled to have their rights determined, and such provision vesting the water-master, an administrative officer charged with the duty of carrying out decrees fixing water rights, with large powers out of harmony with Section 6617, L. O. L., defining his duties.

**Waters and Watercourses—Review—Determination of Rights.**

13.    The Supreme Court cannot, on appeal in a proceeding for determination of water rights, review the decree as to questions not involved in the appeal, at the instance of a nonappealing party.

From Umatilla: Gilbert W. Phelps, Judge.

In Banc.

This is a proceeding initiated by the United States as a consumer of water of the Umatilla River to have the rights of the several water users upon that stream adjudicated under the provisions of the Water Code of 1909, codified in Section 6635, et seq., L. O. L.   The stream in question takes its rise in the Blue Mountains in the eastern part of Umatilla County and augmented by several affluents in its course, flows northerly and northwesterly until it unites with the Columbia River. One of its tributaries is Butter Creek which, roughly speaking, parallels it on the west and empties into it a few miles south of its junction with the Columbia. In pursuance of the notice issued by the water board at the suit of the general government more than two hundred individuals filed claims to the use of the water of the Umatilla River and its tributaries.   The Western Land & Irrigation Company appeals from the final decree of the Circuit Court which ultimately determined the rights of the parties after the findings of the water board had been filed in that court.   It is stated in the brief of the appellant that

"the parties whose interests may be affected by this appeal are the appellant, Western Land & Irrigation Company, and the respondents, United States of America, Furnish Ditch Company, and possibly to some extent the Dillon Irrigation Company."

The principal contention is between the appellant whom, for the sake of brevity, we will call the Western

Company, and the United States. Speaking as a generalization, the assignments of error relate to the giving of preference to the United States over the Western Company in respect to their several appropriations of water; regulating the terms of contracts made with actual water users by concerns which divert water for the purpose of sale to others; determining the rate of the use of water; failing to make separate findings upon the issue of loss by seepage and evaporation; and, lastly, in effect awarding the Furnish Ditch Company a priority over the Western Company. AFFIRMED.

For appellant, Western Land & Irrigation Company, there was a brief and an oral argument by *Mr. W. G. Drowley.*

For respondent, United States of America, there was a brief with oral arguments by *Mr. Oliver P. Morton* and *Mr. Will R. King* (Chief Counsel U. S. Rec. Service).

For respondent, Dillon Irrigation Company, there was a brief filed over the names of *Mr. Frederick Steiwer, Mr. Harrison Allen* and *Mr. R. R. Johnson.*

For respondent, Courtney Irrigation Company, there was a brief filed by *Mr. James A. Fee.*

For respondent, Brownell Ditch Company, there was a brief filed by *Mr. Stephen A. Lowell.*

For respondents, Oregon Land & Water Company, Pioneer Irrigation Company, Maxwell Ditch Company, Furnish Ditch Company, W. T. Walton, Sidney Walton, Harry R. Newport, F. H. Gritman and H. G. Hurlburt, there was a brief filed by *Mr. James H. Raley.*

BURNETT, J.—1. The Western Company traces all its claims to operations under the Act of February 18, 1891, codified in Chapter 1 of Title XLIII, L. O. L., which provided that a corporation desiring to divert water for irrigation purposes should post in a conspicuous place at the point of diversion a notice in writing containing a statement of the name of the ditch, canal, or flume, and of the owner thereof, the point at which its headgate was proposed to be constructed, a general description of the course of the conduit, the size thereof in width and depth, and the number and amount of water by miner's measurement to be appropriated, together with the number of reservoirs, if any: Section 6528, L. O. L. It was also required that the appropriator should file a map showing the general route of its ditch, canal, or flume. The manifest intention of the law was to demand a definite limitation of the scheme of the concern desiring to appropriate water so that others contemplating a like enterprise might be advised of how much of the stream was available for further projects. As to the appropriation of water in the arid and semi-arid portions of the United States the rule well supported by court decisions and crystallized into statutory form by the Act of February 27, 1913, Chapter 279, is that "beneficial use shall be the basis, the measure, and the limit of all rights to the use of water": *Simmons* v. *Winters,* 21 Or. 35 (27 Pac. 7, 28 Am. St. Rep. 727); *Hindman* v. *Rizor,* 21 Or. 112 (27 Pac. 13); *Hough* v. *Porter,* 51 Or. 318 (95 Pac. 732, 98 Pac. 1083, 102 Pac. 728); *Mann* v. *Parker,* 48 Or. 321 (86 Pac. 598); *Caviness* v. *La Grande Irr. Co.,* 60 Or. 410 (119 Pac. 731); *In Re Schollmeyer,* 69 Or. 210 (138 Pac. 211). To the extent that water is wasted or is used extravagantly

appropriation in its true sense is vitiated. Priority attaches only to what is reasonable and necessary for a beneficial purpose. Excessive greed and avarice in the appropriation of water cannot be countenanced or gratified.

2. As a source of title prior to the appropriation initiated by its immediate grantee, the Western Company claims (1) under a notice filed by the Umatilla Meadows and Butter Creek Canal Company posted March 8, 1891, proposing to appropriate 10,000 miner's inches of water; (2) under a notice of J. M. Jones et al., posted March 25, 1891, claiming 50,000 miner's inches; and (3) under the notice of the Columbia Valley Land & Irrigation Company posted October 24, 1891, declaring its design to take out 80,000 miner's inches in addition to the amount specified in the preceding notices which it claimed to have purchased. These three rights, whatever they amounted to, were acquired by the Hinkle Ditch Company which posted its notice for 225,000 miner's inches on March 14, 1903. Concerning them we adopt the statement made by the Western Company in its brief, giving a history of the operations of the Columbia Valley Land & Irrigation Company after it acquired the rights of the first two appropriators mentioned: "The headgate was washed out in the winter of 1894 and no further use was made of the ditch until the advent of the Hinkle Company, which succeeded to the Hunt rights." Notwithstanding this admission, amply supported by testimony as it is, the Western Company maintains that nonuser will not work abandonment of water rights unless it has continued for ten years and hence that the period between the destruction of the headgate in 1894 and the initiative of the Hinkle Company on March 14, 1903,

was not sufficient to bring about that result. It is true that the courts have decided that an absolute nonuser of a water right for ten years conclusively amounts to an abandonment, but it does not follow that a result of this sort may not be accomplished in less time. Indeed, a water user could abandon his project instantly. Formerly the difficulty was in the proof of the abandonment. However, to set such matters at rest, the Act of February 18, 1891, *supra,* to which the Western Company traces all its rights, established a rule in Section 22, codified as Section 6546, L. O. L., in this language:

"The right to appropriate money (water) hereby granted may be lost by abandonment; and if any corporation constructing a ditch or canal or flume under the provisions of this act shall fail or neglect to use the same for the period of one year at any time, it shall be taken and deemed to have abandoned its appropriation, and the water appropriated shall revert to the public, and be subject to other appropriations in order of priority; but the question of abandonment shall be one of fact, to be tried and determined as other questions of fact."

This excerpt is to be distinguished from Section 6571, L. O. L., fixing the period of nonuser at two years, the latter being part of the Act of February 18, 1899, relating to the taking of water for the purpose of developing the mineral resources of the state and furnishing electrical power; while the former is embodied in the act of February 18, 1891, concerning the appropriation of water for irrigation and domestic use and for watering livestock. The two acts treat of different subjects and each provides its own limit of nonuser as a ground of forfeiture. They are not contradictory.

Confessedly, as stated in the brief and as we think is manifest from the evidence, the predecessors of the Western Company utterly failed to make any use of their water conduit for more than one year. The statute mentioned draws but one conclusion from this established fact and that is abandonment, with the consequence that the water sought reverts to the public and is subject to other appropriations in order of priority. Under these circumstances the Circuit Court was right in refusing to recognize any of the Western Company's predecessors in title earlier than the Hinkle Ditch Company which began operations March 14, 1903, and in fixing this as the date of the former's rights.

3. The notice and map of the Hinkle Ditch Company is in evidence. After describing the point of diversion on the western bank of the Umatilla River the notice states:

"The general direction of said ditch and flume is to be in a westerly direction from this point of diversion of water a distance of about 12 miles to Butter Creek."

The accompanying map shows this same condition of a single ditch running from the Umatilla to Butter Creek. This notice marks the limit of the proposed enterprise, and activities beyond its scope constitute new ventures requiring additional notice complying with the terms of the statute as for the inauguration of a new appropriation: *Andrews* v. *Donnelly*, 59 Or. 138 (116 Pac. 569).

Using March 14, 1903, as a starting point for the Hinkle Ditch enterprise to which the Western Company succeeded, the Circuit Court ascertained the amount of acreage to which that appropriation of water might be beneficially and economically applied,

giving it the date of priority last above mentioned. In our judgment the testimony supports this conclusion of fact and defines the limit of the Hinkle Ditch Company's appropriation under its original notice.

4. The general government acquired by purchase what is known as the Minnehaha Ditch and the Maxwell Ditch. It is enough to say of these that the finding of the Circuit Court that the right under one of these is completely vested as to ½ second-foot as of date November 14, 1894, and under the other for 25 second-feet for 2000 acres of land as of date February 25, 1904, is well grounded in evidence. The remainder of the claim of the United States is based upon the Act of February 27, 1905, which so far as applicable here is found in Chapter 5, Title XLIII, L. O. L. Section 2 of that act, Section 6588, L. O. L., reads thus:

"Whenever the proper officers of the United States, authorized by law to construct works for the utilization of water within the state, shall file in the office of the state engineer a written notice that the United States intends to utilize certain specified waters, the waters described in such notice and unappropriated at the date of the filing thereof shall not be subject to further appropriation under the laws of this state, but shall be deemed to have been appropriated by the United States; provided, that within a period of three years from the date of filing such notice the proper officer of the United States shall file final plans of the proposed works in the office of the state engineer for his information; and provided further, that within four years from the date of such notice the United States shall authorize the construction of such proposed work. No adverse claims to the use of the water required in connection with such plans shall be acquired under the laws of this state except as for such amount of said waters described in such notice as may be formally released in writing by an officer of the

United States thereunto duly authorized which release shall also be filed in the office of the state engineer. In case of failure of the United States to file such plans or authorized construction of such works within the respective periods herein provided, the waters specified in such notice, filed by the United States, shall become subject to appropriation by other parties. Notice of the withdrawal herein mentioned shall be published by the state engineer in a newspaper published and of general circulation in the stream system affected thereby, and a like notice upon the release of any lands so withdrawn, such notices to be published for a period not exceeding thirty days.''

We find in the record a notice addressed to the state engineer signed by John T. Whistler, United States district engineer, who, in turn derives his authority from the Secretary of the Interior under the provisions of the act of Congress of June 17, 1902, informing the state engineer that ''the United States intends to use all the surplus and unappropriated waters of the Umatilla River and its tributaries in connection with the reclamation of certain arid lands as provided for under said act of Congress and requests that said waters be withdrawn from further appropriation as provided under the laws of this state.'' No question is made but what the United States complied with the statutory rules promulgated by the legislature of this state respecting the manner in which the general government could appropriate water in Oregon. The procedure under this act vested the United States with title to all the then unappropriated water of the Umatilla River with priority dating from September 6, 1905, above noted. The Circuit Court gave priority to the Western Company as of March 14, 1903, for 4109.68 acres of land and as of July, 1907, for 12,747.48 acres, thus making it secondary to the United States

88 Or.—25

as to the larger area. We may well doubt if there was any water left which could be applied to this 12,747.48 acre tract after the appropriation by the United States, for its notice demanded all the then unappropriated waters of the Umatilla River, and the statute in question expressly stated that waters "unappropriated at the date of the filing thereof shall not be subject to further appropriation under the laws of this state but shall be deemed to have been appropriated by the United States." Under the provisions of the act it would seem that the decree was more favorable to the appellant than it could ask, but the general government has not appealed from the decree and hence no further notice will be taken of that feature.

The Western Company complains of the court's finding, Number 25, which is here quoted:

"That in all cases where any person, firm or corporation has a right under this decree to supply and deliver water to others and charge for the same, or may hereafter acquire such right, it is the duty of such person, firm or corporation to supply water to any and all persons, firm or corporation, or who can be reasonably supplied with water from said works under reasonable and uniform contracts and for reasonable and uniform charges up to the limit of the capacity of said works, so long as said person so taking such water complies or is ready to and able to comply with the terms of such contract. Such contract may provide for any reasonable and uniform method of *pro rata* distribution of water, and such person, firm or corporation may make such reasonable and uniform rules and regulations as may be necessary to facilitate such distribution. In case such contract does not provide for such distribution of water then such water shall be supplied to the water users in the order of, and according to the date of priority of use upon the land, or at the place upon which such water is to be used, and sub-

ject to rotation as in this decree generally provided; provided, that no contract shall be made to deliver water to lands or places not theretofore supplied, to such an extent as to deprive any land or place of water which has been previously supplied, and provided further, that no contract shall be made to deliver water for irrigation or power unless the land or place where said water is to be used be entitled to such use under a right granted by this decree, or a permit of the state engineer, or by a water right certificate.

"All contracts for the use of water giving any preference other than as herein stated, are against the public policy and laws of the state of Oregon, and void."

There is nothing in this portion of the decree inimical to principles applicable to all public service corporations in their dealings with the public and there is no just ground of complaint against its terms.

5. It was again assigned as error that the court was mistaken in determining that in all cases where the diversion is at the rate of 1/40 of a second-foot per acre it shall include all loss by seepage and evaporation, but when the rate is 1/80 of a second-foot per acre an increase of not to exceed twenty per cent may be allowed for loss by seepage and evaporation, and that the court should have made a distinct and separate finding upon that question. The court classified the lands involved in the projects under consideration according to the nature of the soil, whether previously irrigated or not, and whether arid lands, or those which had been reduced to cultivation by the application of water. It was ascertained as a fact, which we deem to be supported by the weight of the testimony, that 1/40 of a second-foot per acre was sufficient for some classes of land and one-half of that amount for other kinds and under other conditions. The matter

of seepage and evaporation was merely incidental to this finding of fact and was properly treated as such.

Lastly, the appellant complains that the effect of the court's decree was to postpone its rights as to 12,747.48 acres and make it subordinate to the right of the Furnish Ditch Company. This latter concern dates its appropriation from March 8, 1905, and it is so tabulated in the decree of the trial court. As already shown the Western Land Company dates from March 14, 1903, as to 4109.68 acres and the court so determined. As to that, the priorities are preserved between it and the Furnish Ditch Company. The record shows that as to all additional appropriations beyond the original announced intention of the Hinkle Ditch Company they were not inaugurated until July, 1907. We cannot disturb the legal effect of these well-founded facts.

6. Without having appealed from the decision of the Circuit Court the Dillon Irrigation Company has appeared in this court by new counsel and has filed a motion, supported by an *ex parte* affidavit, asking for some material modifications and amplifications of the decree of the Circuit Court. The original jurisdiction of the Supreme Court is confined to cases of *mandamus, quo warranto,* and *habeas corpus:* Article VII, § 2 of the Constitution. Injunction has been employed in ancillary fashion to preserve the status of the subject of litigation during the pendency of an appeal: *Livesley* v. *Krebs Hop Co.,* 57 Or. 352 (97 Pac. 718, 107 Pac. 460, 112 Pac. 1); *Lais* v. *Silverton,* 77 Or. 434 (147 Pac. 398, 150 Pac. 269, 151 Pac. 712); *Kollock & Co.* v. *Leyde,* 77 Or. 569 (143 Pac. 621, 151 Pac. 733); *Coopey* v. *Keady,* 81 Or. 218 (139 Pac. 108).

Aside from this, we have decided many times that our appellate jurisdiction is acquired only by service of notice of appeal and have constantly declined to hear causes in which it was either not served at all or served out of time.   Despite all this, however, by the motion in hand we are called upon to go into a new investigation involving the consideration of testimony presented now for the first time in the form of affidavits and so to revise the decree of the Circuit Court as upon an original proceeding to impeach it.   We have no jurisdiction to proceed in that manner.   The practice is marked out by Section 6650, L. O. L., as amended by Chapter 97, Laws of 1913, stating that in cases of this sort "appeals may be taken to the Supreme Court from such decrees in the same manner and with the same effect as in other cases in equity." If the movant disdained to employ this appellate remedy, we cannot supply its place with an original proceeding in this court.   Moreover, supplementing the power lodged in every court to make its records speak the truth as against mere clerical misprisions, the Water Code has afforded relief in Section 6654, L. O. L., reading thus:

"Within six months from the date of the decree of the Circuit Court determining the rights upon any stream, or if appealed within six months from the decision of the Supreme Court, the board of control, or any party interested, may apply to the Circuit Court for a rehearing upon grounds to be stated in the application.   Thereupon, if in the discretion of the court it shall appear that there are good grounds for the rehearing, the Circuit Court, or judge thereof, shall make an order fixing a time and place when such application shall be heard.   The clerk of the Circuit Court shall, at the expense of the petitioner, forthwith mail written notice of said application to the board of con-

trol and to every party interested, and state in such notice the time and place when such application will be heard.''

Under these circumstances the motion of the Dillon Irrigation Company must be denied. ·

A careful examination of the voluminous record fails to disclose error in the determination of the Circuit Court and it is therefore affirmed.

AFFIRMED.    MODIFIED ON REHEARING.

MR. JUSTICE BEAN took no part in the consideration of this case.

Modified on rehearing April 16, 1918.

ON REHEARING.

(172 Pac. 97.)

*Mr. W. G. Drowley,* for the petition.

*Mr. Harrison Allen, Mr. R. R. Johnson, Mr. Frederick Steiwer, Mr. Oliver P. Morton, Mr. Will R. King,* Chief Counsel U. S. Rec. Service, *Mr. James A. Fee, Mr. Stephen A. Lowell* and *Mr. James H. Raley, contra.*

In Banc.

McCAMANT, J.—A rehearing was granted in this case, not because we were dissatisfied with the conclusions reached by Mr. Justice BURNETT, but because of the importance of the case and the earnest insistence of counsel for appellant that in the hurry of the Pendleton term no opportunity was given adequately to present the contentions relied on. The case has accordingly been reargued with ability and we have been favored with additional written briefs, strongly pre-

senting the contentions of the respective parties.   With
the assistance so rendered by counsel, we have re-
examined the voluminous record.

Appellant's petition for a rehearing acquiesces in so
much of the original opinion as holds that the rights
initiated in 1891 were lost by abandonment.   We think
that there is no room for difference of opinion as to
the correctness of the conclusions announced in the
former opinion on this subject.

The contention on the part of appellant which is
most strenuously presented is that the Circuit Court
erred in dividing appellant's priorities, and in fixing
its priority for 12,747.48 acres as of July, 1907.   Ap-
pellant claims that its entire appropriation of water
should be referred to March 14, 1903.   The decree of
the lower court awarded to appellant a water right
with a priority as of the latter date applicable to
4,109.68 acres.   The lands covered by this priority un-
der the decree of the Circuit Court are lands lying be-
tween the headgate of appellant's ditch and Butter
Creek, including also some hundreds of acres west of
Butter Creek, the priority covering substantially the
bottom lands in the neighborhood of this watercourse.
The lands as to which a 1907 priority is decreed lie
west and north of the properties above referred to.
They are all situate west of the Umatilla River and
beyond the Butter Creek bottoms.   Appellant's claim to
the priority contended for is predicated on its rights as
the successor in interest of the Hinkle Ditch Company.

Appellant directs our attention to Section 6533,
L. O. L.   This statute is a part of the act of 1891.   It
requires the appropriator of water to commence the
actual construction of his ditch within six months from
the date of posting his notice of appropriation.   The
statute directs that:

"The actual capacity of said ditch or canal, or flume, when completed, shall determine the extent of the appropriation, anything contained in the notice to the contrary notwithstanding."

If appellant's rights are to be determined by this principle, we are driven to the conclusion that appellant was liberally dealt with by the decree appealed from. It appears from the testimony of H. D. Newell that he measured the water in the Hinkle ditch on January 16, 1906, which was four months subsequent to the time when the rights of the United States attached. He found that the ditch, eight miles from the headgate, was carrying 39.9 second-feet of water. The testimony shows that this amount of water would scarcely suffice for the irrigation of the lands as to which appellant was awarded a 1903 priority.

7. In response to so much of the previous opinion as quotes the notice of appropriation posted by Hinkle Ditch Company March 14, 1903, appellant cites Section 6595, subdivision 7, L. O. L. This statute is as follows:

"Where appropriations of water heretofore attempted have been undertaken in good faith, and the work of construction or improvement thereunder has been in good faith commenced and diligently prosecuted, such appropriations shall not be set aside or avoided, in proceedings under this act, because of any irregularity or insufficiency of the notice by law, or in the manner of posting, recording, or publication thereof."

If it appeared that the notice of appropriation under which appellant claims was inaccurate through some mistake in drawing it, appellant could invoke the curative effect of the above statute with propriety. But it affirmatively appears that there was no such mistake.

Mr. J. T. Hinkle, president of the Hinkle Ditch Company, which made the appropriation, was better

qualified than any other witness to testify as to the intention of this company at the time when the appropriation was made.   He was asked the following question:

"The location notice as filed by the Hinkle Ditch Company in 1903 properly expressed the intention of the Company, did it, in regard to the irrigation of the lands?"

He answered:

"I think it fairly expressed the intention."

The notice of appropriation described a ditch or flume extending a distance of twelve miles to Butter Creek.   The map filed at the time the appropriation was made, pursuant to the requirements of Section 6529, L. O. L., covered no lands as to which the decree of the lower court gave appellant a 1907 priority.   The ditch noted on this map terminated at Butter Creek.

Mr. Hinkle and Mr. O. D. Teel were the promoters of the Hinkle Ditch Company and were more familiar than anyone else with its plans at the time when its appropriation of water was made.   Mr. Hinkle testifies:

"We proposed to build that canal on there and irrigate all the land that it would irrigate in any practical manner and to reach all the land we could reach by extension of it, and at that time we had no permanent surveys of our own, we were depending on some very uncertain preliminary work, and upon such record of previous surveys as we could find and we aimed to make the appropriation large enough to provide for ourselves, and to provide for the government who was then doing some geological work in the neighborhood and preliminary work, and to provide for any other people who might come in and enlarge our canal and make use of it."

This testimony tends to show that the Hinkle Ditch Company hoped that its enterprise would prove to be

one of large dimensions. It is apparent that the plans were ill-defined and lacked the precision essential to the creation of the rights now contended for. Mr. O. D. Teel testifies on this same subject as follows:

"Q. What was the purpose of the Hinkle Ditch Company, and what lands in a general way did it intend to irrigate when its appropriation was made?

"A. We expected to irrigate all lands lying under the ditch that were not provided for by prior appropriations of other ditches.

"Q. Had you at the time you made the appropriation, determined definitely what lands would ultimately fall under the system, when built?

"A. They were largely on Butter Creek bottom, and beyond Butter Creek, principally beyond Butter Creek.

"Q. How did they correspond with the lands at present coming under the system?

"A. They were about the same, if not practically the same proposition."

It appears that in 1903 and 1904 a number of homestead entries were made on the properties as to which a 1907 priority was awarded appellant. Mr. Teel testified with reference to the irrigation of the lands of these homesteaders as follows:

"Q. Were the homesteaders expecting to get water from the Hinkle Company?

"A. When they went in there, I think they did not.

"Q. Did they later on, when the Hinkle Company started out to cover that section with its ditches?

"A. As I remember, they tried to make some contracts with us and didn't have any money and could not give any security and we could not build down in there to irrigate just what few there were in there, what few lands were available under the circumstances, that had something to do with the size of our headgate, the second one we put in there."

Mr. Hinkle testified on this same subject as follows:

"Q. Do you recall the time when these homestead entrymen attempted to get the Hinkle Ditch Company to construct a ditch down there?

"A. Yes, sir, I recollect it.

"Q. Do you recall that the Hinkle Ditch Company said, if they would construct the ditch themselves they would deliver water to them down there?

"A. Possibly, if at that time they wanted to get the ditch down there, they would either have to build it themselves or pay the Hinkle Ditch Company enough money on water rights to enable the Hinkle Ditch Company to build it.

"Q. That was about the summer of 1907, wasn't it?

"A. No, that was along about 1905."

8, 9. We think the general testimony of Mr. Hinkle and Mr. Teel as to the purposes of Hinkle Ditch Company when it made its appropriation must yield to the specific testimony to the effect that the company did not intend, in 1905, to extend its ditches into the tracts of land as to which a priority of 1907 was awarded. The attitude of Mr. Hinkle and Mr. Teel with reference to this extension negatives the claim that in 1905 or at any time prior thereto the Hinkle Ditch Company had any matured plans for the reclamation of lands lying west and north of the Butter Creek bottoms. Most of these lands were withdrawn from entry by the General Land Office on March 17, 1904, and were not restored until October 2, 1907.

The testimony clearly shows that at the inception of its undertaking the Hinkle Ditch Company constructed a ditch one and one-half miles in length. During the latter part of 1903 and during the years 1904 and 1905 but little work was done on the ditch by the Hinkle Ditch Company, and that little had to do with repairs and improvements, rather than with extensions. The extension work which was done during that period

was done by the Butter Creek Water Company and the
Cold Springs Irrigation Ditch Company, under con-
tracts made by them with Hinkle Ditch Company.
The former corporation was interested in the irriga-
tion of lands in the Butter Creek bottoms, and the lat-
ter in the irrigation of lands on the east side of the
Umatilla River, now included in the government pro-
ject. The work done by these corporations did not
look to the irrigation of the twelve thousand acres as
to which this appellant was given a 1907 priority. It
is doubtless true that appellant, as the successor in
interest of the Hinkle Ditch Company, is entitled to
avail itself of the work done on the ditch by these cor-
porations, but we fail to find in the evidence any inti-
mation that this work looked to the irrigation of the
lands with which we are concerned on this appeal. It
is intimated by Mr. Justice WOLVERTON in *Nevada
Ditch Co.* v. *Bennett,* 30 Or. 59, 94 (45 Pac. 472, 60 Am.
St. Rep. 777), that where an appropriator acquires an
inchoate right to water for purposes of irrigation, he
may apply this water to lands other than those which
he originally intended to irrigate. He may appro-
priate water with intent to irrigate Whiteacre, which
he owns, and, if he proceeds with due diligence, he
may use the right so initiated for the irrigation of
Blackacre, providing it be equivalent in area and in its
water requirements. In order that this doctrine may
be properly applied there must be a continuing inten-
tion to irrigate a well-defined acreage. If the intention
to irrigate Whiteacre is abandoned before the inten-
tion to irrigate Blackacre becomes fixed, the water right
is lost. The evidence clearly shows that the intention
to irrigate the lands east of the Umatilla River, now
included in the Hermiston project of the federal gov-
ernment, was abandoned in the late summer of 1905,

at the time when the government project took definite
shape.    The evidence strongly negatives any intention
of the Hinkle Ditch Company at that time, or for a
year or more thereafter, to irrigate the properties
lying west and north of the Butter Creek bottoms, as
to which a 1907 priority has been awarded appellant.
It appears that this was a period of discouragement to
the officers of the Hinkle Ditch Company.    Their re-
sources were exceedingly limited and on at least one
occasion they offered to dispose of their project for a
small sum of money.

It remains to apply the law arising on the above
facts.    In 2 Kinney on Irrigation and Water Rights
(2 ed.), page 1221, it is said:

"In connection with the claim set forth in the notice,
the court may also examine all the other facts in any
particular case which tend to prove the actual intent
of the appropriator.    Such facts may be such as the
purpose indicated in the notice, the actual amount of
water required for such purpose, the acts of the ap-
propriator in prosecuting the work necessary, the
size of the ditch and its capacity, the method of diver-
sion from the stream, the method of the application
of the water, and any other facts which tend to show
the true purpose of the appropriator."

Pomeroy on Riparian Rights (1 ed.), Section 47,
says:

"There must be some such actual, positive, benefi-
cial purpose, existing at the time, or contemplated in
the future, as the object for which the water is to be
utilized; otherwise no prior and exclusive right to the
water can be acquired."

In *Power* v. *Switzer,* 21 Mont. 523, 530 (55 Pac.
32), the court says:

"The intention of the claimant is a most important
factor in determining the validity of an appropriation

of water. When that is ascertained, limitation of the quantity of water necessary to effectuate his intent can be applied according to the acts, diligence and needs of the appropriator.''

In *Andrews* v. *Donnelly,* 59 Or. 138, 147, 148 (116 Pac. 569), Mr. Justice BURNETT says:

''The right of a prior appropriator is paramount but the right is limited to such an amount of water as is reasonably necessary for such useful purpose and project as may be fairly within contemplation at the time the appropriation is made. * *

''Any material enlargement of an original project or the inauguration of a new enterprise requiring additional water would call for a new appropriation which must be in subordination to the rights of others as then existing.''

These principles are also announced in *Simmons* v. *Winters,* 21 Or. 35, 42 (27 Pac. 7, 28 Am. St. Rep. 727); *Hindman* v. *Rizor,* 21 Or. 112, 120 (27 Pac. 13); *Union Mill Co.* v. *Dangberg,* 81 Fed. 73, 106; *Ortman* v. *Dixon,* 13 Cal. 33, 38. The formation of a new intention to irrigate lands the irrigation of which was not at first contemplated marks the beginning of a new appropriation: *Nevada Ditch Co.* v. *Bennett,* 30 Or. 59, 100 (45 Pac. 472, 60 Am. St. Rep. 777); *Taughenbaugh* v. *Clark,* 6 Colo. App. 235, 243 (40 Pac. 153); *Toohey* v. *Campbell,* 24 Mont. 13, 17 (60 Pac. 396).

On the whole case, we are satisfied that the Hinkle Ditch Company, appellant's predecessor in interest, had no well-defined and continuing plan prior to September 6, 1905, for the irrigation of lands lying west and north of the Butter Creek bottoms. The decree of the lower court was liberal, as we read the evidence, in its allowance to appellant of the lands covered by its appropriation of March 14, 1903. The

rights of the United States, which became fixed September 6, 1905, are certainly prior and paramount to those of this appellant, in the irrigation of the 12,747.48 acres as to which a priority of 1907 is awarded.

10. Appellant also contends that the Circuit Court erred in awarding the United States three hundred and fifty cubic feet of water per second and in failing to make this allowance conditional on the diligence of the government in completing its project. This portion of the decree followed the plain mandate of the statute, Section 6588 L. O. L. This portion of appellant's petition argues a legislative, not a judicial question. By the statute quoted in the previous opinion the legislature withdrew from further appropriation the waters of such streams as the United States should elect to utilize in the manner therein pointed out. The United States has accepted the grant and conformed to the terms thereof. The legislature could not displace water rights which had vested prior to the acceptance by the United States of the provisions of the statute, but the plain precept of the law vests the United States with title to all waters not theretofore appropriated. The claim of the government is limited to three hundred and fifty cubic feet, but this claim must be sustained regardless of the diligence of the government in matters not specified in the statute, and regardless of the amount of water required to irrigate the lands served by the government ditches.

11. The Circuit Court made a finding on the subject of contracts between irrigation companies and water users to whom they supply water. It was provided:

"Such contract may provide for any reasonable and uniform method of *pro rata* distribution of water, and

such person, firm or corporation may make such reasonable and uniform rules and regulations as may be necessary to facilitate such distribution. In case such contract does not provide for such distribution of water then such water shall be supplied to the water users in the order of, and according to the date of priority of use upon the land, or at the place upon which such water is to be used. * *

"All contracts for the use of water giving any preference other than as herein stated, are against the public policy and laws of the State of Oregon, and void."

It is contended that the priority as between appellant's water users should be based on the dates of their contracts. In *Mann* v. *Parker,* 48 Or. 321, 323 (86 Pac. 598), Mr. Chief Justice BEAN says:

"An appropriator of water acquires a right therein only to the extent to which it is applied to a beneficial use."

This is also the doctrine of *Claypool* v. *O'Neill,* 65 Or. 511, 514 (133 Pac. 349). A party holding a contract with appellant for the use of water should be required to apply the water to a beneficial purpose or to yield his priority to one who does make such beneficial use of the water. The foregoing was one of the incidental provisions of the decree and it was properly incorporated therein, although the subject was not mentioned in the claims filed by the parties.

A great deal of testimony was taken on the subject of seepage and evaporation. This testimony was contradictory, but the conclusions of the Circuit Court are supported by cogent proof and we are not convinced that they should be modified.

12. Our attention is directed on the rehearing to the following provision in the decree of the Circuit Court:

"That the specifications of a definite amount of water per acre, in these findings, shall not be taken as granting that specific amount of water to any water user, but shall only be taken as a rule and guide for the water-master in the distribution of a maximum amount of water to any water user."

As a result of this burdensome litigation the parties are entitled to have their rights determined. The conclusions reached are not to be disregarded and lightly set aside. The duties of water-masters are defined by Section 6617, L. O. L., and are in part as follows:

"It shall be the duty of the said water-masters to divide the water of the natural streams or other sources of supply of his district among the several ditches and reservoirs, taking water therefrom, according to the rights of each respectively, in whole or in part, and to shut and fasten, or cause to be shut and fastened, the headgates of ditches, and shall regulate or cause to be regulated, the controlling works of reservoirs, in time of scarcity of water, as may be necessary by reason of the rights existing from said streams of his district."

The water-master is an administrative officer charged with the duty of carrying out decrees fixing water rights. The provision above quoted from the decree vests the water-master with large powers out of harmony with the statute and with sound principles. That portion of the decree will be eliminated.

13. The Dillon Irrigation Company presses its contentions upon us with great earnestness. It is argued that proceedings for the determination of water rights are *sui generis* and that it has been determined in *Hough* v. *Porter,* 51 Or. 318, 437–440 (95 Pac. 732, 98 Pac. 1083, 102 Pac. 728); that in such a proceeding relief can be given in this court to a party who has not appealed. As we read the authority cited, it holds

that where an appeal in a proceeding for the determination of water rights brings before the appellate court the parties entitled to the water, the court will pass such a decree as appellant is entitled to under the law and the evidence, even though such decree be more favorable than that of the lower court to parties who have not appealed. The questions urged by the Dillon Irrigation Company are not involved in the appeal of Western Land and Irrigation Company, nor has that appellant shown a right to have the decree of the Circuit Court modified except in the matter of administration above referred to. If we were to entertain the contentions of Dillon Irrigation Company we would review the decree at the instance of a party who has not appealed and our conclusions would be extrajudicial. Such action on our part would violate principles repeatedly reaffirmed and unquestionably sound: *Thornton* v. *Krimbel,* 28 Or. 271 (42 Pac. 995); *Goldsmith* v. *Elwert,* 31 Or. 539, 549 (50 Pac. 867); *Board of Regents* v. *Hutchinson,* 46 Or. 57, 58 (78 Pac. 1028); *McCoy* v. *Crossfield,* 54 Or. 591, 592 (104 Pac. 423); *Mathews* v. *Chambers Power Co.,* 81 Or. 251, 255 (159 Pac. 564).

The decree will be modified in the respect above indicated. In all other respects the decree is affirmed and the former opinion is adhered to.

                              Modified on Rehearing.

Mr. Justice Bean took no part in the consideration of this case.