Argued March 6, 1929; modified March 25; rehearing denied and
opinion modified December 30, 1930

# In re WATER RIGHTS OF DESCHUTES RIVER AND TRIBUTARIES

(286 P. 563, 294 P. 1049)

626

*W. Lair Thompson* of Portland (H. H. De Armond of Bend and McCamant & Thompson of Portland on the brief) for appellant Central Oregon Irrigation Dist.; also for respondent as against appellants.

*Arthur L. Veazie* of Portland (Veazie & Veazie of Portland on brief) for appellant Columbia Deschutes Power Co.

*Jay H. Upton* of Bend for appellant Cline Falls Power Company.

*Henry S. Gray* of Portland (Ralph S. Hamilton of Bend on brief) for appellant Deschutes Power & Light Company.

. *Percy A. Cupper* of Salem and *A. C. Shaw* of Portland for appellant Odin Falls Land Co.

*B. S. Huntington* of Portland (Huntington, Wilson & Huntington of Portland on the brief) for appellant Walker Basin Irrigation Co.

*Oswald West* of Portland for appellants North Canal Co. and Crook County Improvement Dist. No. 1.

*Gustav Anderson* of Portland for respondent Arnold Irr. Co.

*N. G. Wallace* of Bend for respondents Deschutes County Municipal Iimprovement Dist. and Jefferson Water Conservancy Dist.

*Max A. Cunning* and *George H. Brewster* both of Redmond, amicus curiae, for City of Redmond.

BEAN, J. A short history, as indicated in the briefs and record, relates that the Deschutes river is a nonnavigable stream and has well-defined banks and bed and flows directly north from Central Oregon. It is, perhaps, the longest and most important stream which, throughout its entire course, traverses the arid region of the state of Oregon. In the section through which this river flows there is no other source of water for most of the irrigated land.

The entire drainage area of the system is 9,180 square miles. The flow at the mouth fluctuates generally between 5,000 second feet and 8,000 second feet. Short time flood peaks do not usually exceed 16,000 second feet. The minimum flow over the land of the Columbia Deschutes Power company on the lower part of the river is approximately 4,500 second feet.

## Drainage Area

Deschutes river rises in the northern part of Klamath county, Oregon. Its drainage basin lies immediately east of the Cascade range, which the river parallels in its northerly course of nearly 200 miles to its confluence with the Columbia river. The arid and treeless portion of Central Oregon merges on the west into the less arid basin of the Deschutes, comprising about 9,000 square miles, in which the annual rainfall varies from about 10 inches along the main stream to as high as 100 inches at the crest of the Cascades, 30 miles westward. The upper portion of the drainage area, particularly to the south and west, is rough and mountainous and well forested. The agricultural lands consist largely of high table lands cut by deep canyons through which the river and its tributaries flow, and small areas of tillable land bordering the streams. The river is swift-flowing, especially in the lower portion where for a distance of over 100 miles it flows in a deep canyon. This portion of the stream is fed by large springs and important tributaries, and this fact, together with its unusual uniformity of flow makes the stream valuable for power development. Irrigation is essential for any material agricultural development in this region, although dry farming has been successful in some localities. The summer flow in the upper basin has practically all been appropriated for irrigation and other uses. Storage winterflow is possible in the upper portion of the basin. On the lower portion of the stream diversions for irrigation on a large scale are not feassible on account of the great elevation of the lands above the stream channels. The waters of the stream have as yet been only partially utilized for power, but there is a minimum flow of approximately 3,500 second feet available for this purpose when the entire flow of the river above is being diverted for irrigation.

The Deschutes river is unlike any other stream in the state of Oregon in that the rise and fall does not exceed one foot from season to season, notwithstanding the fact that it has its source on the eastern slope of the Cascade mountains at the foot of the snow-capped peaks. There is a heavy run-off from the melting of the snows in the spring, yet on account of the porous condition of the territory through which the river flows, there is no perceptible rise in the river.

It developed in the adjudication that there were rights claimed for power purposes undeveloped, for power purposes developed, for irrigation and for domestic use and for stock water. As to the claims for power presently undeveloped on the lower stretches of the Deschutes river, the claimants stipulated priority in those who used the waters on the upper stretches of the river for irrigation.

### APPEAL OF CENTRAL OREGON IRRIGATION DISTRICT

The Central Oregon Irrigation district is located on that part of the eastern Oregon plateau in which the soil consists of volcanic ash and throughout which there are numerous outcroppings of rock that have been through nature's fire. The irrigation areas within the district are in patches and extend over a distance of 40 miles. There is a difference in elevation of the land of 700 feet within the district and climatic conditions are so different that the crop season is two weeks earlier in some portions of the district than in others. In the lower earlier sections, at the north end of the district, three cuttings of alfalfa hay may be obtained each year, while at the upper or south end of the district, but two cuttings are available.

The district is served by two canals, one leading almost directly north from the diversion works, known

as the Pilot Butte canal, the other branching in an easterly and northern direction known as the Central Oregon canal. One has a length of upwards of 40 miles; the other a length of upwards of 28 miles. Throughout this large area will be found some "made" soil, where there have been stream washes, etc., underlaid with gravel, and it is claimed this soil requires an unusual amount or low duty of water, even for this locality, while it is true of the entire district that because of the volcanic formation a large amount of water is required for the proper irrigation of crops.

The canals are constructed through volcanic rock, which is not water tight, resulting in a large seepage loss. These conditions make it impossible for the people living within the irrigation district to get their domestic or stock water from wells. Resort has been had to concrete cisterns, which must be filled at intervals with water from the irrigation ditches, thus presenting a serious question of adequate water supply for human beings and livestock during the winter season when water must be obtained at intervals when there is a flow of water without freezing.

The Central Oregon Irrigation district's claim is the successor in interest to the first effort to reclaim land on the Deschutes river under the Carey act. The rights claimed by claimant were initiated by the Pilot Butte Development company and the Oregon Irrigation company, to the rights of both, of which companies the Deschutes Irrigation and Power company succeeded in 1904. The latter company was succeeded by the Central Oregon Irrigation company in 1910.

On October 31, 1900, the Pilot Butte Development company posted on the banks of the Deschutes river, a short distance above what is now the city of Bend,

and duly filed a notice claiming 50,000 miner's inches under a six-inch pressure, or approximately 1,250 cubic feet per second of the flow of the stream, and duly filed the notice on November 5, 1900. At the same time at a point some distance down stream a similar notice was posted, in order that a diversion point might be preserved that would best serve the requirements disclosed by a survey. Rival claimants posted notices, and all of them applied for contracts to reclaim land under the Carey act. These claims were all eventually acquired by the Deschutes Irrigation and Power company, which was organized for the purpose and purchased the prior interests in 1904.

■ To constitute a valid appropriation of water three elements must always exist: (1) An intent to apply the water to some beneficial use existing at the time or contemplated in the future; (2) a diversion from the natural channel by means of a ditch, channel or other structure; and (3) the application of it within a reasonable time to some useful purpose: *Low v. Rizor,* 25 Or. 551, 557 (37 P. 82); *Nevada Ditch Co. v. Bennett,* 30 Or. 59 (45 P. 472, 60 Am. St. Rep. 777).

Immediately after posting the notices of October 31, 1900, the definite preliminary work for appropriating the water was undertaken by Pilot Butte Development company. Extensive surveys were undertaken and diligently prosecuted. This section was then 150 miles from rail transportation and the work of definitely effecting the actual diversion of the water was diligently prosecuted. Near the end of 1901, after surveys, a preliminary contract for the reclamation of the land under the Carey act was executed with the state of Oregon, and eventually segregation lists numbers 6 and 19 were made pursuant to the applications of the predecessor

in interest of this claimant covering approximately 140,000 acres of land of which about 85,000 acres are irrigable lands.

Actual construction work begun in 1903 and by the year 1904 the first diversion was effected with a flume of 70 cubic feet per second capacity taken out of the Deschutes river at the point of posting, about four miles above the city of Bend. By 1905 this flume had been increased to a capacity of 742 second feet, much in excess of the then requirements of the lands under cultivation within the segregations. Work continued and about $2,000,000 were expended in constructing new irrigation canals and laterals and enlarging older ones to meet the needs of the increasing area reclaimed.

In 1907 the Deschutes Irrigation & Power company posted a notice of intention to divert water at a point near where the second notice had been posted in 1900, a point which is now known as the intake of the North canal. The city of Bend had developed in the meantime and, in order not to widen the canal and conduct all of the water necessary through the city and deprive its citizens of water for industrial purposes, the North canal was developed north of the city.

Every six months during this period new notices were posted at the point where this diversion was proposed to be made. In the year 1909 construction of this canal was commenced. A concrete dam was constructed across the river and a canal cut to a conjunction with the old Pilot Butte canal, the work going through solid rock, which was later lined with cement, requiring a period of three years. Since that time the major portion of the water used by claimant has been diverted through the North canal, instead of through the city of Bend with all of the attending inconveniences and difficulties.

In 1900 the cities of Bend and Redmond were not yet in existence. In the territory included in the 48,000 acres of the project there was scarcely a soul residing. The land was uninhabitable and wholly nonproductive. In the surrounding territory of Bend and Redmond there are now about 2,000 people living on the farms distributed throughout the entire project under the two canals.

In 1910 the Deschutes Irrigation & Power company was reorganized under the name of the Central Oregon Irrigation company. Pursuant to provisions of the laws of Oregon the Central Oregon Irrigation district was organized in the year 1917 to take over so much of the system of the Central Oregon Irrigation company as might be necessary to serve the needs of the irrigable lands then served by that company, and in the year 1921, pursuant to decree of the circuit court, in a suit trying out the right of the irrigation district to supplant a water users' association for that purpose, title was transferred to the irrigation district.

The original appropriators estimated that one second foot of water would irrigate 160 acres of land; afterward experience and necessity caused a modification to one second foot for 100 acres of land. The original plan was to reclaim approximately 140,000 acres, but it was discovered that the appropriation must be applied to a much smaller acreage. About 20 years after the initiation of the appropriation within the Central Oregon Irrigation district, reclaimed by the original appropriation of the Pilot Butte Development company, there was approximately 48,000 acres of irrigable land and property within the district of assessed valuation of about $3,500,000.

The trial court and state engineer found the appropriation, upon which this claimant's right rests, to

have been duly initiated and diligently prosecuted. The court determined that because that portion of the appropriation, in excess of 742 second feet, was diverted through the new works of the North canal, it could not relate back to the original appropriation. This resulted in an award to this claimant of a date of relative priority of October 31, 1900, of 742 second feet of water for the irrigation of 47,983 acres and a date of relative priority of December 2, 1907, for the balance of water necessary to irrigate its number of acres of land.

This claimant contends that the construction of the North canal and its dam and intake was simply a change in the place of diversion from the Pilot Butte Development company diversion as to a large part of the appropriation initiated by the notice of October 31, 1900. This constitutes the main complaint of this claimant.

The trial court held that the diversion by the Central Oregon Irrigation district's predecessor through the North canal constituted a new appropriation.

We have then for consideration, the original notice of appropriation on October 31, 1900, of 1,200 second feet of water by the Pilot Butte Development company posted at the point of the present intake of the Pilot Butte canal, which called for a canal 25 feet wide by 8 feet deep, or in two or more flumes of an equivalent capacity and the size of a canal sufficient to receive and conduct the waters from such flume and the map of general location; and the construction work of the miles of canals, flumes, syphons and lateral ditches, the expenditure of millions of dollars, the reclamation of about 48,000 acres of land and the beneficial use of water thereon mentioned in the notice. The notice was duly filed in the county clerk's office on November 5, 1900.

The Pilot Butte Development system was gradually increased to supply the demand of the new system for water for irrigation, domestic use and for watering livestock. In 1906 about 1,000 acres were irrigated. The area was gradually increased so that January 1, 1912, there were about 49,000 acres reclaimed and 54,400 on October 1 of that year.

In 1907, pursuant to a prior order of the state land board, the duty of water under this project was increased to one cubic foot per second for 100 acres and the loss in seepage and evaporation was found to be about 40 per cent instead of 30 per cent, as first estimated, which occasioned a decrease in the number of acres in the project. Originally in the project there were 140,700 acres, now 48,000 acres are served within the district. This was under contract with the state, which contract is now completed. An additional 20,000 acres originally in the project are within the plans of the North Canal company which, as to such lands, has succeeded to the interest of the Central Oregon Irrigation company.

During the period of development there were several enlargements of the intake and forebay of the Pilot Butte Development company canal to accommodate the lands which were contemplated to be irrigated when the notice of appropriation was filed. In 1904 the flume of the Pilot Butte Development company, diverting water from the river, had a capacity of 70 second feet. This was enlarged in 1905 to a capacity of 742 second feet. This water was served to the land through the two main canals; the Pilot Butte canal going north and carrying 302 second feet of water and the Central Oregon canal leading east carrying 440 second feet. At the lower part of the flume from

the intake, the water was divided and carried for a short distance in two flumes and then on in the two main canals mentioned.

At the time of making the order for a lower duty of water on this project, the state land board further recognized that the entire flow of the Deschutes river, when the water was low, would probably be required for this project. At that time the size of the original diversion works had been increased to a canal 16 feet wide by 5 feet deep, which was sufficient to serve the lands then being served by the company. The size of a canal required to divert 1,250 cubic feet of water per second, as proposed in the original notice of appropriation posted at the intake, was 25 feet wide by 8 feet deep.

The water passing through the Pilot Butte canal went through the city of Bend. Claims had been filed for water for industrial purposes to be used within the municipal boundaries. For these reasons the Pilot Butte Development company determined to increase the capacity of its diversion works and at the same time change the point of diversion for a portion of the water from the point of intake above, to a short distance below the city. As a matter of precaution the company posted a notice of appropriation claiming 1,000 second feet of water at the intake of the present North canal. Construction was commenced in 1909 and diligently prosecuted to completion in 1912.

This claimant contends that, in so far as the water covered by the original notice of appropriation filed October 31, 1900, is concerned, this did not constitute a new appropriation. In so far as the construction

of the North canal contemplated the use of water in addition to 1,250 second feet covered by the 1900 appropriation, it constituted a new appropriation.

The North canal was constructed of sufficient capacity to carry both the water for 20,000 acres, which the North Canal company contemplated irrigating, and the water for the irrigation development of the Pilot Butte Development company, as it had progressed to that date. It appears it was the intention to use the same water through the North canal diversion that had been covered by the appropriation of October 31, 1900. See *In re Waters of Umatilla River*, 88 Or. 376 (168 P. 922, 172 P. 97, L. R. A. 1918D, 1131).

The North canal was completed through heavy rock construction work. It was concrete lined, thereby saving a loss which would have occurred through the dirt canal leading from south of the city of Bend. As stated, the lands claimed under the original project were sufficient to require all of the water embraced in the notice of appropriation of 1900. The North canal was constructed below Bend for 1.41 miles to connect with the Pilot Butte canal. There is no indication disclosed in the testimony of an intention to waive or abandon any part of the original appropriation.

■ This claimant contends that where a change in the point of diversion is made without intent to abandon a prior appropriation to be carried in whole, or in part, through a new diversion and without injury to others, it does not waive any part of the original appropriation. Citing: *In re Rights of Waters of Silvies River*, 115 Or. 27, 49 (237 P. 322). In that case it appeared that one Camblin appropriated water in 1886 and in 1913 constructed a new ditch at a new

location through which the water was diverted. The court, at page 49 of the report, held the right to relate back to the original appropriation:

"The change made in the ditch, taken from the river in 1913, was a mere relocation in the place of taking out the water and not a new appropriation. The water was diverted from the same stream system. The extension of Camblin's ditch on the west side of the river, which was constructed in 1886, to his other land, does not appear to have been an enlargement or a new appropriation, but rather the completion of the application of the water to a beneficial use. This was done with due diligence and within a reasonable time."

*Turvey v. Kincaid*, 111 Or. 237 (226 P. 219). Here the court sustained a change in the method of diverting water from a stream and held, in effect, that subsequent appropriators cannot complain of a change in the method or point of diversion so long as the amount of water taken is not more than the original appropriator is entitled to, and does not damage those making subsequent appropriations.

*In re Water Rights of Hood River*, 114 Or. 112, 130 (227 P. 1065):

"The fact that the first headgate was washed out and its location changed is a contingency contemplated by the act of 1891. No intervening rights have been affected, this does not impair the right of the appropriator. The same water was utilized at the new intake as was proposed to be used at the former: § 5635, L. O. L."

In *Hough v. Porter*, 51 Or. 318, 429 (95 P. 732; 98 P. 1083, 102 P. 728), it was stated:

"The appropriator can use either the original canal or ditch as constructed, or any other channel for the purpose of conveying the water to any point of use."

The finding of the state land board, and of the court, that much more water must be delivered to an acre of land than originally contemplated, has resulted in requiring the delivery of the original appropriation to 48,000 acres of land, but these acres are within the area originally contemplated. The water is beneficially used. The entire development of this project has been carried on as a Carey act project: *In Re Water Rights of Hood River,* 114 Or. 112, 130 (227 P. 1065).

■ The Pilot Butte canal and the Central Oregon canal serve two separate subdivisions in the Central Oregon Irrigation district. Both of these subdivisions are a part of one original Carey act unit. The Central Oregon canal serves the territory in the vicinity of and east of Bend and that section known locally as "Powell Buttes." The Pilot Butte canal system is served by the North canal and the Pilot Butte canal and embraces the area from Bend to Crooked river and is situated more closely to the Deschutes river. As between the purchasers, under the project, there is no priority of a water right under a Carey act project with the same appropriation by the company. It would be an impossibility to develop an irrigation project under the Carey act which would not give the purchasers in the project during the period of development the same priority. An irrigation district is required to serve all of its water users alike.

The development of this project has unquestionably been prosecuted with diligence and with as much despatch as could reasonably be expected under the prevailing circumstances. If the company, the predecessor in interest of the irrigation district, had seen fit to enlarge its intake and flume of the Pilot Butte

canal, to a capacity sufficient to carry 50,000 miner's inches under a six-inch pressure, or approximately 1,250 cubic feet per second, instead of changing the place of diversion of a portion of the water to the North canal, we think their right to that amount of water would have been unquestioned. Changing the place of diversion and avoiding the necessity of enlarging their canal through the city of Bend, which city sprung up after the posting of the original notice, thereby saving enlarging a long ditch and a long and expensive flume, would accomplish a saving in the waste of the water and obtain a more feasible system of supplying the water to the originally proposed lands, which were designated by the notice of appropriation and were pointed out upon the maps of the project. This would constitute a notice to all subsequent appropriators of water from the river and to the world that it was the intention of the originators of the project to divert the amount of water mentioned in the notice, or so much thereof as might be necessary for the reclamation of the lands embraced and generally described within the project. In fact it included more land than it was finally determined to reclaim.

There is no good reason why a change of the point of diversion cannot be made before water works are completed to their full capacity as well as afterwards. In fact, it would seem the better method and would simply save expense in construction. The sooner such change is made, the better.

Not only the notice and maps and construction, but the predecessor in interest of this claimant, immediately following the posting of these notices and again during the spring and summer of 1901, made a careful survey and examination of the lands to be

embraced by this project and a plan of reclamation was prepared for submission to the state land board of the state of Oregon.

Thereupon, on September 11, 1901, the Pilot Butte Development company, predecessor in interest to claimant, made application to the state land board of the state of Oregon for a preliminary contract for the reclamation of the lands included in what was later designated "Carey Act Segregation List No. 6."

On November 7, 1901, the Oregon Irrigation company, predecessor in interest to claimant, made application to the state land board of the state of Oregon for a preliminary contract for the reclamation of the lands included in what was later designated as "Carey Act Segregation List No. 19."

On December 2, 1901, a preliminary contract between the Pilot Butte Development company, predecessor in interest to claimant, and the state of Oregon, for the reclamation of lands designated in "Carey Act Segregation List No. 6" was executed.

On May 31, 1902, the final contract between the said Pilot Butte Development company and the state of Oregon, providing for the reclamation of lands in "Carey Act Segregation List No. 6," was executed.

It would seem that in addition to construction notice the subsequent appropriators must have had actual notice of the proposed Carey act reclamation by the predecessor of Central Oregon Irrigation district.

The circuit court found that "the completion of the North Canal dam and 1.4 miles of the main canal marks the termination of the construction work extending the Central Oregon Irrigation company's system, except later enlargements mentioned."

The decree recites:

"It is further found that the company, in diverting through the North canal certain portions of the water formerly diverted at the point of the original posting through the Central Oregon and Pilot Butte canals, did not injure other vested rights on the stream, and the district will therefore be entitled to divert the quantity of water which it is entitled to use, at the head of the Central Oregon canal, or at the head of the North canal, in accordance with its needs.

■■ The right of a prior appropriator is paramount, and the right is limited to such an amount of water as is reasonably necessary for such use and project as may be fairly within contemplation at the time the appropriation is made: *Andrews v. Donnelly,* 59 Or. 138, 147, 148 (116 P. 569).

Instead of extending the system of canals so as to embrace more territory than that contemplated in the notice of appropriation the proposed area was diminished from about 140,000 acres to approximately 48,000 acres.

■ Under all the circumstances shown by the testimony, which are too numerous to mention, we think that the construction of the North canal and dam was a change of the place of diversion of a portion of the original diversion contemplated south of the city of Bend, and not a new appropriation. Originally the diversion devices were constructed cheaply for a somewhat temporary use, in order to minimize the loss when new construction became necessary. The increase, in carrying capacity of the same diversion device, was progressively continued until about 1905, when it was sufficient to meet the need of the water users for some years. The next increase was effected by the construction of new and permanent diversion

works at the head of the North canal. In short, the original proposed system, for which a notice of appropriation was posted October 31, 1900, was not completed until the North canal and dam was built, which was completed in 1912. This, under all of the circumstances, was consummated with diligence and within a reasonable time.

■ The posting of the new notice at the intake of the North canal, which was, as indicated by the testimony, a matter of precaution as to a portion of the water, did not constitute a waiver of any right gained by the former notice of appropriation posted south of the city, or destroy any part of such right, where the appropriator did not intend to waive any prior claims, or rights, which it had, by virtue of the original notice of appropriation and where the water system was prosecuted with due diligence and completed within a reasonable time. *In re Waters of Silvies River*, supra, this court said at p. 42 of 115 Or.:

"A party having a right to the use of the water of a stream for the purpose of irrigating land by virtue of a prior appropriation, by organizing a corporation and participating in the posting and recording of a notice of appropriation in the name of such corporation, or posting notices of appropriation and recording the same in order to strengthen his rights in his own name, does not necessarily waive or relinquish his right to the water which he had prior to such posting of a notice."

In I Wiel on Water Rights in the Western States (3d Ed.), page 426 it is stated: "If an appropriator, after duly posting a notice, and while prosecuting his work with diligence, posts a second notice of appropriation of the same water, the right may still relate back to the first notice."

The posting of the later notice by the predecessor in interest of this claimant, at the intake of the North canal, was not an indication of an intention to abandon their claim to the water as per the original notice. It was an assertion of their claim, not an abandonment. By all the authorities the notices are to be liberally construed: *Osgood v. El Dorado Co.,* 56 Cal. 571, 579.

The following map depicts the change of diversion made:

In the development of the project in question a vast amount of money has been expended. Maps and notice thereof are on file in the public offices giving the extent of the project and of the claim to water. No one could have been misled by an additional notice.

In the consideration of the construction of the canal system there are various matters that should be taken into account. It is a matter of common knowledge that an application for the reclamation of land, under the Carey act, must undergo, or pass through, various channels and be "subject to much procedure, or what is usually called 'red tape.' " Lack of funds, or a stringency in the money market, preventing or hindering for a time rapid construction of a water system, has in more recent years been taken into consideration.

The necessity for the use of the water or the demand made by settlers who, under the Carey act, were contemplated to be purchasers of the land, with a water right, is one of the controlling elements in the construction and development of such a project. The construction of the system should keep pace, or a little in advance, of the demands for water for reclaiming the lands in the project. If the promoters of such a project were required, in the first instance, to construct a system sufficient to supply either 140,-000 acres, as at first contemplated, or 48,000 acres, as was contemplated by the revised figures, when only a few hundred or a thousand acres of land in the project would be reclaimed during such construction, then it would simply be an impossibility under any available financial arrangement to construct such a system and carry through such a project.

*In re Water Rights of Hood River,* 114 Or. 112 (227 P. 1065). After much study and research by dif-

ferent members of the court, which suggested the thoughts expressed, it not all being the language of the writer, this court said, as recorded at page 133 of the report:

"It would be vain and useless to require an appropriator to construct works necessary to make the entire appropriation of water for all the land intended to be irrigated at the inception of the project when it is not in readiness to receive the same and there is no immediate purpose for which the water can be used. The law does not require impossibilities nor compel settlers to cultivate all their land within a short time, or be deprived of the benefit of a large portion of the water right which has been properly initiated for the purpose of irrigating their irrigable lands: 2 Kinney on Irrig., § 740."

At page 137 of the report appears the statement:

"It will avail nothing to an appropriator to divert a greater quantity of water than is presently required even though he has a definite plan to use the excess in the future."

And also at page 131, we read:

"In the prosecution of the construction of a system of works necessary for the diversion and application of water, in an attempted appropriation of the same, the diligence required by the law does not involve unusual or extraordinary efforts. That which is usual and ordinary with men engaged in like enterprises who desire to speedily effect their designs is required. There must be such assiduity of work of construction of the system as will manifest to the world a bona fide intention to complete it within a reasonable time. The question is one of fact and must be determined from the circumstances surrounding each case."

See *In re Rogue River Adjudication*, 120 Or. 237, 243 (251 P. 898) ; *Cameron v. Buckley*, 117 Or. 477, 480, 481 (244 P. 662).

10. We think that the progressive reclamation of the large area of land, by the predecessors in interest of the district, was in keeping with the demands of the rules of law covering such procedure and that the doctrine of relation applies to practically the entire appropriation of 50,000 miner's inches, under a six-inch pressure, as described in the original notice, or 1,250 cubic feet per second, or so much thereof as may be necessary to irrigate the 48,000 acres of land. First in time, first in right, is the rule that should be applied: *Low v. Schaffer,* 24 Or. 239 (33 P. 678); *McCall v. Porter,* 42 Or. 49 (70 P. 820, 71 P. 976); *Caviness v. La Grande Irr. Co.,* 60 Or. 410 (119 P. 731); *In re Waters of Silvies River,* 115 Or. 27, 87 (237 P. 322).

It is contended by some of the respondents that when the Pilot Butte Development company canal was constructed to a capacity of 742 second feet, it was a "completion" of the canal and measured the rights of the predecessors in interest of the Central Oregon Irrigation district. This is the crux of the matter. If the system was then completed, no further rights could be tacked on or added. If the system was not then completed, but was enlarged by the construction of the North canal to carry out the original project, as proposed by the notice of the appropriation filed in 1900, and the map filed therewith, then the system was not completed until the North canal was constructed. The North canal, which is 1.41 miles in length, as constructed from below Bend, is merely a cut-off and connects with the Pilot Butte canal. The originally proposed system was not completed in 1905. There remained a vast area of the original project yet to be provided for and reclaimed.

 As held in *In re Waters of Umatilla River,* 88 Or. 377 (168 P. 922, 172 P. 97), the notice and the map which § 6528, L. O. L., requires an appropriator of water for irrigation to file, marks the limit of the proposed enterprise. It is then not only the notice to the subsequent appropriators that they should heed, but the map of location as well. The notice of appropriation, posted at the river bank and filed with the county clerk in 1900, after describing the point of intake where the notice was posted, recites:

"The course of said flume or canal shall be in a general northerly direction with the canyon of said river for a mile or so and thence in a northerly or easterly direction towards Pilot butte with laterals and branches towards the old river bed and towards Farewell bend and emptying any surplus waters, as feeders of the Long Butte canal into said Long Butte canal near Pilot Butte on the north and again on the northeast through the said old river bed; the size of the flume shall be 25 feet wide and 8 feet deep, or in two or more flumes of equivalent capacity and the size of the canal sufficient to receive and conduct the waters from said flume. The intention is to appropriate 50,000 cubic inches of waters by miner's measurement under a six-inch pressure, and to construct at this point of diversion a dam of sufficient height to convey said waters by flumes and canal out of the river channel and in the direction designated, and to use said dam as a reservoir and for other purposes authorized by the laws of Oregon and of the United States and by the articles of incorporation of this company."

Subsequent appropriators desiring to appropriate waters from the Deschutes river, seeing this notice of appropriation, and the map of record, were provided with knowledge of the contemplated appropriation.

In 1905 a flume of the size of 25 feet wide and 8 feet deep, or two or more flumes of equivalent capacity, and a canal of a size sufficient to receive and conduct the waters from such flume, had not then been constructed by the Pilot Butte Development company or its successors. The appropriation was not complete. The canal and diversion works had then been constructed of sufficient size to meet the requirements for irrigating the land then reclaimed and embraced in the original proposed reclamation project, but the construction contemplated by the notice of appropriation had not been carried out. Subsequent appropriators would have been benefited by the failure of the Pilot Butte Development company and its successors to have completed the works to a size mentioned in the notice of appropriation. The Arnold Irrigation company, among others, took such chance and made a subsequent appropriation.

It is claimed by the Arnold Irrigation company, among other things, that the decree of the circuit court for Deschutes county, known as the Dietrich decree of July 9, 1921, which authorized the transfer of the system by the Central Oregon Irrigation company to the Central Oregon Irrigation district "determined the status of North canal appropriation, then contributing to the Pilot Butte canal, and as a whole called 'Central Oregon Irrigation System' as 'subsequent in time and inferior in right' to the Pilot Butte canal appropriation completed and consummated in 1905 pursuant to the notice posted in 1900."

The parties then dealing with this water system were acquainted with the facts and circumstances and existing conditions then prevailing, but we find no such provision in that decree. On the other hand, the circuit court in rendering the Dietrich decree recog-

nized that apportion of the water was furnished to the intake of the Pilot Butte canal through the North canal and diverted by means of the North canal dam, as shown by the following provision of the decree:

"That each and every acre of irrigable land for which defendant, Central Oregon Irrigation System, in Deschutes, Jefferson and Crook counties, Oregon, (consisting of the Central Oregon canal, Pilot Butte canal, and such portion of the North canal and North canal dam as is required to furnish the water necessary for diversion into the intake of the Pilot Butte canal), together with laterals and ditches therefrom, is entitled to receive, and is hereby awarded sufficient water to raise ordinary agricultural crops during the irrigation season from April first to November first of each year, and during the period of maximum use, from May 23, to August 20 (90 days) of each year, sufficient water to cover each acre of irrigable land to a depth of 1.8 feet, delivered on the land; and also at other times throughout the year sufficient water for stock and domestic purposes of the occupant or occupants of the lands aforesaid; and that all of the water aforesaid is hereby declared to be appurtenant to said land, and that the rights of the Central Oregon Irrigation district and of said land to divert from the direct flow of the Deschutes river, at the intake of the Central Oregon canal and at defendant Central Oregon Irrigation company's North canal dam, sufficient water to deliver the above amounts to the land, in addition to the actual loss in transmission thereto, *are hereby adjudged to be prior and superior to any and all rights which said defendant Central Oregon Irrigation company may have.*" (Italics ours.)

This was partly on account of the Central Oregon Irrigation company reserving certain rights which were not transferred to the Central Oregon Irrigation district and which rights it will be necessary to hereafter consider. The decree mentioned is binding upon

the parties thereto. It was entered upon a stipulation reciting many facts which then existed, many of which are still pertinent to the present conditions. It is also persuasive as to such conditions as they affect other claimants.

(As defined in paragraph 7-b of Dietrich decree):

" 'Excess Acres' are hereby defined to be and include all irrigable lands within each legal subdivision under present existing contracts for water rights and release of lien, for the irrigation of which irrigable lands the owner thereof has not purchased, or contracted to purchase, water, and the number of such excess acres within all of the lands now under contract and mentioned in this decree is determined by this decree to be not in excess of 2,500 acres.''

When the canal, commenced by the Pilot Butte Development company, was completed, according to the notice of appropriatiion, then the capacity of the system was a measure of the rights of the original appropriator and its successors, but not until such completion: *Whited v. Cavin,* 55 Or. 98, 107 (105 P. 396); *In Re Waters of Umatilla River,* 88 Or. 376, 383 (168 P. 922, 172 P. 97); *Seaweard v. Pac. Livestock Co.,* 49 Or. 157, 161 (88 P. 963); 2 Kinney, Irrigation & Water Rights (2d Ed.), § 882, p. 1562.

■ It is the contention of some of the respondents that the court below had no authority to fix the duty of water for lands of the Central Oregon Irrigation district in excess of 1.8 acre feet per acre during the period from May 23 to August 20 of each year. This contention is based upon the inclusion in the contract for the Carey Act Reclamation that the reclaiming company's contract with the settler should contain the following provision:

"Sufficient water for ordinary irrigation purposes during the irrigation season from April 1, to

November 1 of each year, and during the period of maximum use from May 23 to August 20 (90 days) of each year sufficient water to cover each acre of irrigable land to a depth of one and eight-tenths (1.8) feet, also a carrying capacity of the canal system sufficient therefor.''

This provision is again carried verbatim into the Dietrich decree. The purpose of the contract is to require sufficient water to properly irrigate the land for agricultural crops, and a fair interpretation thereof is that the minimum which the irrigation company must deliver during this period of maximum use, so-called, is 1.8 feet per acre.

■ The provision in regard to 1.8 acre feet per acre amounts to no more than an estimate of the minimum quantity during the period of maximum use. The thing required and contemplated by the United States government, the state of Oregon, the promoters of the project and the settlers at the time of the making of the contracts and since, was, that ''sufficient water for ordinary irrigation purposes during the irrigation season'' should be furnished for the land. It appears that the duty of water on this project was changed by the state land board as the development of the project and the cultivation and irrigation of the land demonstrated that it required a lower duty of water. Thus the carrying out of the contract shows that 1.8 acre feet per acre was not a fixed amount necessary for the cultivation of ordinary crops. The contract may be susceptible of more than one construction, that actually placed upon it by the parties to it will be more readily received in construing the contract by the court: *Jaloff v. United Auto Indem. Exch.*, 120 Or. 392 (250 P. 717); *Mitau v. Roddan*, 149 Cal. 1 (84 P. 145, 6 L. R. A. (N. S.) 275). Any holding that the duty

of water on this project is limited to 1.8 acre feet per acre would be to defeat the development of this irrigation district and result in depopulation of the district.

Objection is made to the claim of the Central Oregon Irrigation district for the reason that the rights were initiated by "contractor" companies not for the purpose of irrigating their own land, and was therefore speculative. In irrigation undertakings of this kind it is almost absolutely essential that the work be accomplished by organized effort. Of course the object of the promoters was gain. It is asserted that the predecessors of claimant expended about $2,000,-000 and sold land and water rights amounting to approximately $1,000,000.

It was the plan of the water law of 1891, and runs all through the cases, that an appropriation may be made by one person for the future use of another; and for the future use upon lands which the appropriator does not then own, or which he does not contemplate owning and which he never does own. It is sufficient for the validity of the appropriation if the original intention is, that the water filed upon is for use upon certain lands then definitely had in mind, and it is reasonably anticipated that when the diversion is ultimately completed and the water ready for application to that land, or other land or uses which have been substituted for the originally considered and intended land, such land will be then, or with reasonable diligence thereafter ready to receive it: *Nevada Ditch Co. v. Bennett,* 30 Or. 59, 89 (45 P. 472, 60 Am. St. Rep. 777) ; *In re Water Rights of Hood River,* 114 Or., at pages 137-8.

The Central Oregon Irrigation district will be awarded a date of relative priority of October 31,

1900, for 985 cubic feet per second of water to be taken from the Deschutes river for the irrigation of 47,983 acres of land served by its system and a date of December 2, 1907, for any balance that may be necessary for said land to be used in the manner and according to the duty of water as fixed by the trial court, or as may be hereafter regularly fixed for said district.

The Central Oregon Irrigation district complains of the general provision of the decree of the trial court as follows:

"Irrigation Rights Appurtenant to Land. That the rights to the use of water for irrigation purposes hereby confirmed are appurtenant to the lands herein described, and the rights of use of the waters of said stream and its tributaries by virtue of such rights are limited and confined to the irrigation of the lands described herein to the extent of said lands herein set forth, and the priorities of right herein confirmed confer no right of use of the waters of said stream and its tributaries on any lands other than those specified tracts to which such rights are herein set forth as appurtenant, and each and every person shall be and hereby is prohibited, restrained, and enjoined from diverting and using water from said stream on such other lands without lawful permit first obtained from the state engineer."

We see no objection to this part of the decree. The decree recognizes, as the testimony indicates, that the North canal and dam are a part of the Pilot Butte Development company system which is a portion of the Central Oregon Irrigation District system.

Water for irrigation purposes is appurtenant to the land for which it is appropriated and applied. It does not follow, however, that the water right cannot be conveyed and separated from the land or

lost to the owner by a failure to comply with the conditions under which he is entitled to use the water. In an irrigation district the land with a water right may be sold for delinquent assessments. A change in the place of use should be made in a regular way which the decree permits.

█ In other words, the water right is appurtenant to, but not inseparable from the land: §§ 5754, 5764, Or. L.; *Farmer's Cooperative Ditch Co. v. Riverside Irrig. Dist.,* (1908) 14 Idaho 450 (94 P. 761); *Hard v. Boise City Irrig. & Land Co.,* 9 Idaho 589 (76 P. 331, 65 L. R. A. 407); 1 Wiel on Water Rights (3d Ed.), § 508, p. 548; *Williams v. Altnow,* 51 Or. 275 (95 P. 200, 97 P. 539).

█ Our statute makes a water right separable from the land to which it is appurtenant only after application to, and approval of, the state engineer subject to review by the courts. Similar statutes exist in several states. Our statute should be given a reasonable construction and a necessary and proper change of the place of use should be allowed when such change will not interfere with any prior or vested right. The burden upon the use should not be enlarged by the change: *In Re Willow Creek,* 74 Or. 592, 638 (144 P. 505, 146 P. 475); *Johnston v. Little Horse Cr. Irr. Co.,* 13 Wyo. 208 (79 P. 22, 70 L. R. A. 341, 110 Am. St. Rep. 986); see also 2 Kinney on Irrig., p. 1816; *Haney v. Neace-Stark Co.,* 108 Or. 93, 115 (216 P. 757, 219 P. 190); *Slosser v. Salt Riv., etc., Co.,* 7 Ariz. 376 (65 P. 332); *Hard v. Boise City Irrig. & Land Co.,* 9 Idaho 589 (76 P. 331, 65 L. R. A. 407).

The requirement of the statute is one of those tending to perfect the recordation of water rights, which were discussed at some length in *Re Willow*

*Creek,* supra. This part of the water code should not be curtailed in a general ruling in a case of this kind.

## MAINTENANCE FEES

Linked with this objection, to a certain extent, is a question in regard to compensation or maintenance fees for water. This matter is regulated by contract and the provision of law authorizing and regulating irrigation districts.

■■ It is a quite well-settled rule that the right conferred on a landowner by his contract with a water company to have water flow from its canal through a lateral ditch, to his land for its irrigation for a term of years or, as a perpetual right, is a servitude on the ditch and canal and an appurtenance to the land, and therefore is real property. After such a contract is duly recorded, where the land owner is required to pay a certain amount yearly therefor, the contract to have the force and effect of a covenant running to and with the land and the canal, it is binding on the successor in title of the company's system, taken with notice of the agreement: *Stanislaus Water Co. v. Bachman,* 152 Cal. 716 (93 P. 858, 15 L. R. A. (N. S.) 359). Other authorities might be cited.

We do not deem that further details in regard to contract matters are embraced in this appeal.

## WATER FOR DOMESTIC USE

■ The testimony shows that owing to the volcanic nature of the lands embraced within the Central Oregon Irrigation district the people living in that district cannot depend upon wells for their domestic and stock water, but must secure such water through their irrigation ditches; and that during the nonirrigating

season freezing weather makes it necessary that this water be delivered in a rather large head to conduct the same to the concrete cisterns on the several farms and a head of 400 second feet is required for such purpose. That amount, namely, 400 second feet, is hereby awarded for storage in systems for domestic and stock water for the people of the district to be diverted during the nonirrigating season. In other respects the provision of the decree of the circuit court for the allowance of water for domestic use and watering livestock is affirmed.

An additional request is made in much the same way by this district as to its right to rent or sell water when the same is not needed or used by the regular water users of the system. Such temporary change of use may not be specified in the water code, but we see no reason why the state engineer cannot permit a part of what is authorized as a whole by the statute, under proper conditions when it would not injuriously affect the rights of other appropriators. This is largely a detail of administration which should be treated in a practical, liberal manner.

The duty of water for said district system and the loss by seepage and evaporation as fixed by the trial court will remain as decreed until the further order of the court. There is an urgent request that the duty of water for the Deschutes system be not permanently decreed until after further experiment and investigation. We know of no objection being made to such request.

The irrigation season for this project is fixed by the trial court from April 1 to August 20 (90 days) of each year.

## Appeal of North Canal Company

In considering the following claims it will not be necessary to repeat what has already been said if it is applicable to any such claim.

The Dietrich decree provided that all unreclaimed lands or portions thereof contained in Segregation Lists Nos. 6 and 19,

"shall not be reclaimed through the use of the Central Oregon or Pilot Butte canals or their laterals or any portion thereof, and all water rights for water to be used on or appropriated for said unreclaimed lands shall be and are hereby expressly decreed to be subsequent in time and inferior in right to the amount of water and the right to divert and appropriate the same from the direct flow of Deschutes river for the use on the lands which had been contracted for sale under the Central Oregon Irrigation system."

### Claim 15-Z

The North Canal company, under claim No. 15-Z claims the right to use from the direct flow of the Deschutes river sufficient water for the irrigation of 591 acres of land, being part of the land referred to in paragraph (c) of the Dietrich decree, at the time the North Canal company enlarged the Pilot Butte canal for the Crook County Improvement district (1922-1923). Additional capacity was provided for carrying water to 591 acres included in this claim.

The circuit court awarded the North Canal company the same date of priority as land in Crook County Improvement district No. 1, namely, December 2, 1907, but provided the right shall be inferior to the rights of the Crook County Improvement district as provided in the contract between the district and the North Canal company.

This decree will be modified by changing the date so as to give the North Canal company a date of relative priority of October 31, 1900, for 15 cubic feet per second of time for 591 acres of land, provided the right shall be inferior to the rights of the Crook County Improvement district No. 1, as provided in the contract between the district and the North Canal company.

## North Canal Company

### Claim 15-X

The North Canal company, under claim 15-X claims a right from the direct flow of the Deschutes for the irrigation of 20,000 acres of land, under date of October 31, 1900, the land being a part of the unpatented acreage remaining in Carey Act segregation list Nos. 6 and 19.

Soon after the transfer of the Central Oregon Irrigation company's system to the Central Oregon Irrigation district, the Central Oregon Irrigation company conveyed its remaining rights, including its interest in the North canal dam and North canal, to the North Canal company, and this company entered into a new contract with the state of Oregon providing for the complete reclamation of 20,000 acres of land in segregation lists Nos. 6 and 19.

The company has renewed, or secured extensions of time on its contracts with the desert land board from time to time. The circuit court awarded the North Canal company, under this claim, a date of relative priority of December 2, 1907, for 333 cubic feet per second of water for the irrigation of 20,000 acres of land.

The decree, as to this claim, is affirmed.

## CLAIM 15-Y

The circuit court awarded this company a date of relative priority of February 28, 1913, for 90,000 acre feet of water per year for storage to be stored at Crane Prairie reservoir, the awards to this company being subject to special provisions set forth in paragraph 39, page 55 of the decree of the circuit court.

The decree in regard to storage rights of the North Canal company is affirmed.

## APPEAL OF CROOK COUNTY IMPROVEMENT DISTRICT No. 1

This claim is substantially as follows:

The district comprises an area of about 3,700 acres of land of which 2,500 acres are classified as irrigable. It is situated north of Crooked river about 10 miles below Prineville. Water for the use of the district is diverted at the North canal dam near Bend, and carried through the North canal to the Pilot Butte canal of the Central Oregon Irrigation district, and from there through said Pilot Butte canal and lateral K to the south bank of Crooked river, where it is received into the system controlled by the Crook County Improvement district No. 1, and carried by means of that system across Crooked river in a syphon on to the district's lands.

Water for the district was purchased from the North Canal company, which company, as successor of the (Central) Oregon Irrigation company, claimed the right as provided in paragraph 7 (c) of the so-called Dietrich decree to cancel the water right of the unsold patented land of segregation lists 6 and 19 of the Central Oregon project and sell its equivalent elsewhere. The water rights for 3,202 irrigable acres which had theretofore been certified as reclaimed, and

for which patent had been issued to the state, were assigned to the district, and the reclamation lien of the company on the lands was relinquished so that they could be reconveyed by the state to the United States.

The district then entered into a contract with the North Canal company providing for the enlargement of the Pilot Butte canal and also entered into a contract with the Central Oregon Irrigation district providing for the delivery of the water through the latter district's canal. The construction work was begun in the fall of the year 1922 and completed in July, 1923, and the water was used for the irrigation of approximately 564.3 acres of land during that year.

It appears that at the time the contract was entered into providing for the enlargement of the Pilot Butte canal and the construction of the irrigation district's system, there was a water right appurtenant to the Carey act lands which had been patented to the state as having been reclaimed by reason of the construction of the Central Oregon Irrigation system. It also appears that the irrigable lands of the Crook County Improvement district No. 1 were of a better quality than those lands which had been patented, and that the transfer of the water right appurtenant to the Carey act lands to the district lands did not injure other rights, and resulted in a more beneficial use of the water.

It also appears that the water right appurtenant to the area canceled was sufficient to supply water for the 2,520 acres of land in the district after taking into consideration the difference in water requirements and canal losses. The water right for the 3,202 acres of patented lands is part of that right initiated

by the Pilot Butte Development company (October 31, 1900). The Dietrich decree provided that the water right appurtenant to the unsold patented land shall be inferior to the rights appurtenant to the lands sold to Carey act settlers theretofore.

Part of the decree of the circuit court will be modified so as to read as follows:

A portion of this right is hereby found to be a part of the appropriation made by the Pilot Butte Development company (Deschutes Irrigation & Power company) of date October 31, 1900. To the extent or amount of 32 second feet of water for 2,520 acres of land a date of relative priority of October 31, 1900, will be awarded Crook County Improvement district No. 1, and the balance necessary for the lands of this district with a date of December 2, 1907, at the North canal dam and to be given those dates of priority with the provision that they are inferior to the rights of the Central Oregon Irrigation district of the date of priority of October 31, 1900, as provided by the conveyance of the water right from the North Canal company, stipulating that the said Central Oregon Irrigation district rights are prior and superior to any right herein confirmed to the North Canal company, except the right for the irrigation of 591 acres of land patented and unsold at the time of the Dietrich decree of July 9, 1920.

As modified the decree as to the Crook County Improvement district No. 1 will be affirmed.

APPEAL OF DESCHUTES POWER & LIGHT COMPANY

(Formerly the Bend Water, Light & Power Company)

■ This appeal involves that part of the trial court's decree which disallows to the Deschutes Power

& Light company that part of its claim for the use of 40 second feet of water of the Deschutes river, in its power operations, for the purpose of carrying off river debris. It is claimed that without such use of the water it would seriously interfere with the successful operation of claimant's power plant located at Bend, Oregon.

This company claims, under a notice of appropriation of water, filed on December 30, 1905, by the Pilot Butte Development company, where it claimed the right to appropriate and divert 2,000 cubic feet per second of the waters of Deschutes river, "for the purpose of developing power for electric and other purposes."

The state engineer allowed this claimant a priority as of December 30, 1905, for 1,325 second feet of water for power purposes and disallowed the additional claim for 50 second feet claimed to take care of debris and ice at the claimant's dam. The circuit court allowed the claimant 10 second feet for carrying off ice from the dam and approved the disallowance by the engineer of 40 second feet claimed for the disposal of debris. The circuit court stated: "In the construction of a dam site of this kind, and the turning of water in the turbines, without exception, is contained devices and means to keep such debris out of the turbines."

■■ An extravagant and wasteful application of water, even though a useful project, or the employment of water in an unbeneficial enterprise, is not included in the term "use" as contemplated by the law of waters: *Caviness v. La Grande*, 60 Or. 410 (119 P. 731); *Cantrall v. Sterling Min. Co.*, 61 Or. 516 (122 P. 42).

In the latter cases it was held, in effect, that one is entitled to use water only in such quantities and at such times as may be reasonably necessary for some useful purpose, either existing or fairly contemplated in the future and cannot waste water even for a useful purpose. "Use of water by any one, in a legal sense, is always qualified by the condition that it must be restricted to such quantity and time of employment only, as may be reasonably necessary for the accomplishment of some useful purpose." The circuit court held that to allow the company to use continuously a volume of water, such as that claimed for carrying off debris, would be to deprive a large body of land that might be irrigated for agricultural purposes. This of itself, under the code, is a greater use than the use that might be made by the water, as claimed, for carrying off debris. We concur in this finding.

■■■ It is a duty of the court in adjudicating water rights to suppress all wasting of water and the court may go further and declare what shall constitute the economic use of the water and to fix its proper duty by a decree awarding the use of a certain amount of water for that purpose. Water is too precious an article in the arid region, or semi-arid region, to be permitted to run to waste: Kinney on Irrigation, etc., (2d Ed.) p. 1622, § 916.

The trial court stated that no doubt the company could devise ways and means to dispose of the debris that comes into the water in the dam and that this disposal, perhaps, could be made without the use of the additional quantity of water.

It is stated in that section of Kinney on Irrigation as follows on page 1623:

"As to the second phase of the proposition, the power of the court of equity to determine what is an

economic use of the water and to make a decree accordingly, we take the same view. As we have said, there is a wide margin between the absolute waste of water and its economical use. But the difference between the two questions is one of degree only.''

■ It is proposed to raise flash boards 12' by 12" on the dam and let the water carry off the matter that has collected in the river above the dam. The measurement for this is 40 second feet of water. It would seem that except at times of high water there would be but little *natural* debris floating in the river. To allow such use during the irrigating season would be equal to depriving about 1,600 acres of land of water for irrigation. This amounts to a waste of water. The trial judge who must be somewhat acquainted with the prevailing condition seemed to believe that the debris could be conveniently cared for in a more economical way. A strong argument is made in support of this appellant's claim, but it is not convincing. There is no question raised as to the facts of this claim. The only thing for consideration is the conclusion to be reached from the facts.

■ The fact that this claim for 40 second feet of water is not contested is not controlling. The state engineer, in an adjudication proceeding of this kind, is only authorized to make an award of water for a legitimate beneficial use. Wasteful methods should be curtailed. Only such awards should be approved by the court.

■ The claim that the matter is not within the issue cannot be maintained. A liberal rule in regard to pleadings (which are blended with the proof) was adopted in this state some time ago: *Hough v. Porter,* 51 Or. 318 (95 P. 732, 98 P. 1083, 102 P. 728). It

is assumed that the award to this claimant of 1,325 second feet of water for power included therein the usual and unavoidable loss.

After considering the record of this claimant we believe it might be beneficial to the claimant and not detrimental to the rights of other appropriators, especially for irrigation, to allow the defendant the use of 40 second feet of water for the purpose of carrying off debris from the water in its dam, during the nonirrigating season, to wit, between November 1 to April 1 of the following year, at such times only as the waters of the Deschutes river are not desired or used for storage purpose for the purpose of irrigation or so as not to interfere with such storage. So with this slight modification the decree as to the rights of the Deschutes Power & Light company is affirmed.

### Appeal of Walker Basin Irrigation Company

■ The Walker Basin Irrigation company, W. M. Huntington, receiver, was awarded a date of relative priority of April 30, 1902, for 9,646.3 acres for irrigation as an inchoate right. It appears that a predecessor in interest of this claimant, the Oregon Development company, on April 30, 1902, posted a notice of appropriation and filed the same for record on May 10, 1902, for the appropriation of the waters of Crescent creek, a tributary of the Little Deschutes river. The area proposed to be irrigated comprised some 31,000 acres. This was decreased from time to time and in 1921, the east unit of the project was relinquished and all claims for water rights therefor were sold to the Tumalo Irrigation district.

The claim filed in this proceeding covers land remaining in the West unit. Surveys for the project

were started October 1901, but very little work was done until about 1910 when the construction work was carried on more rapidly. Since 1919 the company has been in a position to serve all the lands for which a water right is claimed. The trial court held that—"Everything considered, it is believed that sufficient diligence and good faith has been shown by contestee and its predecessor so that the right can still be perfected if reasonable diligence is used in prosecuting the work necessary for completion of the project."

It appears that most of the lands in the project are still unreclaimed, being covered with a dense growth of shake-pine timber, only about 175 acres having been cleared and irrigated up to the time of the decree.

It is decreed that this claimant be allowed an inchoate right with a priority of the date given and "allowed until the first day of October, 1933, in which to apply the water to a beneficial use upon the lands, or within such further time as may be allowed by the state engineer for good cause shown," and further provided that the appropriation should be limited to the quantity of water actually applied to beneficial use within such time and shall be appurtenant to the several tracts of land to which the water shall have been applied.

Claimant represents that in December, 1923, the desert land board, acting for the state of Oregon, issued its certificate to the effect that the laws of the state with respect to the reclamation of the 9,646.30 acres had been complied with in all respects, which certificate was submitted on behalf of the state to the interior department for the issuance of a patent under the several acts of congress, known as the Carey act. Attached to this certificate was the certificate of the state engi-

neer that he had examined the lands designated in the certificates and that an ample supply of water had been actually furnished in a substantial canal for every tract in said list to thoroughly irrigate and reclaim it and to prepare it to raise ordinary agricultural crops.

On January 19, 1922, John E. Morson was duly appointed receiver for the Walker Basin Irrigation company. This claimant's interest in the lands reclaimed and the water whereby they are reclaimed is a lien under the Carey act for $60 per acre to secure the cost of the reclamation. The original plan, survey and construction work of the Walker Basin Irrigation company and its predecessors involved the taking of water of the east fork of the Deschutes river and the delivering to the lands reclaimed of 2.15 acre feet of water per acre, as per the maps and plans submitted to the interior department and the state land board upon which the contracts between the United States and the state and between the state and the reclaiming agent were based.

In this appeal there is one assignment of error in decreeing that this claimant is:

"Allowed until October 1, 1933, in which to apply the water to beneficial use on said land, or within such further time as may be given by the state engineer on good cause shown. * * * The appropriation shall be limited to the quantity of water actually applied to beneficial use within said time."

Section 8 of the act of February 28, 1901, General Laws of Oregon, 1901, p. 382, provides as follows:

"The right to the use of water for irrigation of any tract or subdivision of land reclaimed under the provisions of this act shall become and perpetually remain appurtenant thereto, * * *" subject to maintenance charges and reasonable rules.

The Carey act, so called, authorizing a contract between the state and the United States for the reclamation of desert land and authorizing the state to make contracts to cause said lands to be reclaimed and to induce the settlement and cultivation in accordance with and subject to, the provisions of the Carey act, in the original act provided (43 U. S. Code Ann., last subd. 641, p. 372):

"As fast as any State may furnish satisfactory proof according to such rules and regulations as may be prescribed by the Secretary of the Interior, that any of said lands are irrigated, reclaimed and occupied by actual settlers, patents shall be issued to the State or its assigns for said lands so reclaimed and settled, * * * * "

By the act of June 11, 1896, chap. 420, § 642, U. S. Code Ann., title 43, provision is made that:

"Under any law heretofore or hereafter enacted by any State, providing for the reclamation of arid lands, in pursuance and acceptance of the terms of the grant made in the preceding section, a lien or liens is hereby authorized to be created by the State to which such lands are granted and by no other authority whatever, and when created shall be valid on and against the separate legal subdivsions of land reclaimed, for the actual cost and necessary expenses of reclamation and reasonable interest thereon from the date of reclamation until disposed of to actual settlers; and when an ample supply of water is actually furnished in a substantial ditch or canal, or by artesian wells or reservoirs, to reclaim a particular tract or tracts of such lands, then patents shall issue for the same to such State without regard to settlement of cultivation: * * * "

The legislative act of 1901, already referred to, accepts the provision of the Carey act authorizing the state land board to create a lien, or liens, which shall be

valid on and against the separate legal subdivisions of land reclaimed for the actual and necessary expense of reclamation and reasonable interest thereon "from the date of reclamation until said lien shall have been satisfied."

It will be noticed that it is contemplated by the provision of the Carey act and the state statute accepting the provision thereof, in effect, that the land is considered reclaimed when there is a sufficient supply of water actually furnished in a substantial ditch or canal, or by other means, to reclaim a particular tract. In other words, the amendment of the United States statute eliminating the requirement for settlement and cultivation made an important change in the general plan of reclamation.

Section 5764, Or. L., provides, in part, thus: "All water used in this state for irrigation purposes shall remain appurtenant to the land upon which it is used; * * *."

Section 5717, subd. 6, Or. L., as amended by General Laws of Oregon, 1923, ch. 283, p. 440, provides:

"The state engineer shall have authority, and shall for good cause, shown upon the application of any appropriator or user of water under an appropriation of water made prior to the passage of this act, or in the cases mentioned in subdivisions 3 and 5 of this section, where actual construction work has been commenced prior to said time or within the time provided in law existing at the time of filing this act in the office of the secretary of state, to prescribe the time within which the full amount of the water appropriated shall be applied to a beneficial use, and in determining said time shall grant a reasonable time after the construction of the works or canal or ditch, used for the diversion of the water, * * *."

A similar provision is made by § 5726, Or. L., as amended by the same act of 1923, for an extension of time for the completion of works under any permit issued by the state engineer.

It is not easy to harmonize the provision of the sections just referred to, with the Carey act and the statute of Oregon accepting the same. The contract of the state made with the reclaiming agent was under and pursuant to the provisions of the act of February 28, 1901. By the contract the reclaiming agent both in the matter of acquiring the water and in the matter of the use thereof, was the agent of the state; the water was not appropriated by the reclaiming agent for its own use and benefit but for the use and benefit of the state in effecting the reclamation of the land to be reclaimed.

■ The state of Oregon, through its authorized state engineer, has positively declared that the contract for the reclamation of the land in question has been fully completed by the reclaiming agent and the state is bound by that declaration.

The reclaiming agent is by law given a lien upon the land for its expense and service in reclaiming the land and when the land is sold the purchaser buys, not only the land itself, but the appurtenant water right. Nowhere does the law limit the time within which the reclaiming agent shall sell the land to settlers; necessarily a considerable length of time and probably a very long time will be required to find settlers willing and ready to buy from the state the reclaimed lands.

The claimant's project yet contains much land that is "reclaimed" according to the provisions of the

Carey act, and the provisions of the state engineer and the circuit court, in effect declaring the water not perpetually appurtenant to the land, or that the right to the water is contingent upon its actually being placed upon the land within a limited time, in case the land is not occupied and the water applied within the time limited, which cannot possibly be done, would wipe out the right of a lien upon appurtenant water right land given to the reclaiming agent by the contract between it and the state. To do this after the claimant has in good faith under its contract expended its money and $80,000 of funds borrowed upon its bonds secured by its lien on the land and water rights, in bringing the water to the land and reclaiming it, was not contemplated by the statute. The Carey act and the act of acceptance of 1901, are slightly different from the water code in this respect.

■ We hold that the provisions of the water code above quoted in this regard do not apply to the Carey act land reclaimed under contract with the state prior to such lands and the appurtenant water rights being sold and the lien relinquished. In no other way can the spirit and the intent of the law be carried out.

That part of the decree of the trial court, in substance, as follows: That claimant is "Allowed until October 1, 1933, in which to apply the water to beneficial use on said land, or within such further time as may be given by the state engineer on good cause shown. * * * The appropriation shall be limited to quantity of water actually applied to beneficial use within said time, * * *" is eliminated.

As so modified the decree as to the Walker Basin Irrigation company is affirmed.

APPEAL OF ODIN FALLS LAND COMPANY

■ The Odin Falls Land company filed its statement and proof of claim to a right for 450 second feet of water of the Deschutes river for power development and for irrigation of 2,074 acres of land. The power is required during the irrigation season in lifting water for irrigation purposes and during the remainder of the season a claim is made for general commercial purposes.

On January 7, 1909, claimant posted a notice of appropriation of 50 cubic feet per second and duly recorded the same January 14, 1909. On February 8, 1909, claimant posted a notice of appropriation of 1,800 cubic feet per second of water, and duly recorded the second notice. Both amounts of water were to be taken from Deschutes river. Soon after the notices were posted a dam was constructed and a power house built in which there was installed a turbine, pump and generator in 1920. They have a ditch 22 feet wide at the top and 12½ feet at the bottom, 2½ feet in depth, with a grade of one foot fall to 1,000 feet. A pipe line has been laid from the pump to the canal, which is capable of serving one-half of the land. At the time of the hearing only 145 acres had been irrigated. The power works were installed in 1915 by which some 65 acres of land were irrigated with a 90-foot pump lift. This construction was of a more or less temporary nature but in 1920 a more permanent installation was made with which the company is in a position to irrigate 1,057 acres of land under a 90-foot lift.

The Odin Falls Land company was allowed by the state engineer an inchoate right for the irrigation of 1,057 acres and allowed until October 1, 1930, in which to apply the water to beneficial use upon the land with

a date of relative priority of January 7, 1909, for 50 second feet and February 8, 1909, for the remaining quantity of water to which a right is perfected.

It appears that 150 second feet is required for power use and the state engineer limited the company to that quantity for power purposes and 26.17 second feet for irrigation and fixed the duty of water on this project at 4.17 acre feet per acre at the point of diversion at a head not greater than 1/40th of a second foot per acre for an acre of land irrigated.

The company shows some intention at some time in the future to install additional pumps and irrigate an area of about 1,000 acres under a lift of 150 feet from the river. Practically nothing has been done to carry out such a plan. The state engineer determined that no rights for this part of the project could be acquired under the 1909 filings.

The circuit court found, in substance, that the Odin Falls Land company was entitled to sufficient water for the irrigation of 1,057 acres of land and denied its right to irrigate the remainder of 2,074 acres and held that the use of the water for power development for the Odin Falls Land company was not a beneficial use of water, but allowed the company until 1933 within which to discontinue its use of water for this purpose.

The company asserts that the total expenditures on this project aggregate $125,000; that about $30,000 was expended on construction and equipment in 1920, soon after the world war. The company has contracts outstanding for the irrigation of over 800 acres of land, some of which would have to be under a high lift. It appears that about the first five years after posting notice, 65 acres were irrigated and for about 10 years following 80 acres were irrigated. This particular

claim depends to quite an extent upon local conditions both as to feasibility and prospects for the future. Under all of the circumstances and conditions we do not feel like disturbing the finding of the state engineer and circuit court as to the number of acres for which water has been allowed.

It is contended by this appellant, that if the rights are good in part, as found by the state engineer and the circuit court, they are good to the full extent of the amount required for the purpose for which the appropriations were made. But we do not so understand the record. As to the higher ground, or what is called "under the high lift" not an acre has been irrigated; no works have been constructed for raising the water. After the preparations made for irrigating the land by the lower lift, or the lower land, there seems to have been a halt or hitch. The reclamation of the higher land does not stand upon the same footing as does the lower land mentioned.

Section 5798, Or. L., provides:

"Any person who owns or has the possessory right to any land bordering on any lake or natural stream of water shall have the right to employ wheels, pumps, hydraulic engines, or other machinery for the purpose of raising water to the level required for the use of such water in irrigating any land belonging to such owner; provided, that the use of such water shall not conflict with the better or prior right of any other person."

The learned trial judge evidently considered that the use of 150 second feet of water to be used for power purposes in lifting water for irrigation was not an economical use. It may be that as large returns for such power would not be secured as though the

power were used for the manufacture of flax or wool; nevertheless, we cannot consider the value or proceeds of the power any more than we can figure upon the value of different kinds of crops that might be raised; one kind may take less water and be more valuable than another. In fact, the question of the use of water for power purposes, by this claimant, is an engineering proposition. It is somewhat allied to the claim of Cline Falls Power company. The city of Redmond is also interested as a junior claimant in using water for power to pump water for the city for domestic purposes. The state engineer allowed the claimant 150 cubic feet per second for power purposes. We approve the finding of the state engineer in this respect and sanction that award.

*In re Water Rights of Owyhee River,* 124 Or. 44 (259 P. 292) § 5798, Or. L., was discussed. The undiminished flow of the Owyhee river was desired for operating a water wheel with which to raise water for irrigation. The notice of appropriation was not for power purposes. It was held the claim was unreasonable.

We are referred to the case of *Schodde v. Twin Falls Land & Water Co.,* 224 U. S. 107 (32 S. Ct. 470, 56 L. Ed. 686). This case arose in the state of Idaho. It involved conditions similar to those discussed in the Owyhee case. The current wheel had been placed in the stream and the owner claimed a right to have the current of the stream unimpaired in order that the same might continue to operate his current wheel. It was held that the current of the stream was not subject to appropriation; and, furthermore, that the use of the current of the stream could not be claimed as appurtenant to a right to the use of the waters of the stream for irrigation.

We approve the principle enunciated in those cases, but the facts differ from those relating to the claim in hand. If there is weakness in this claim of appropriation for power purposes, it is in the matter of the fall or head of the water. We cannot say that the claim is not for the use of water for a beneficial purpose. On the other hand it must be classed as an advantageous and beneficial use of the water for power purposes. It is a reasonable use.

Modified as herein indicated, the decree as to this claim is affirmed.

### APPEAL OF CLINE FALLS POWER COMPANY

This appeal involves that portion of the decree of the circuit court modifying the order and determination of the state engineer. The claim is made for water diverted through a ditch and flume for power and also for irrigation and domestic use. The company has a ditch 10 feet wide, of a depth of 5.2 feet and approximately 400 acres of land irrigated. The pump and pipe lines and main canals are constructed with a capacity sufficient to serve 800 acres of claimant's land. This land lies at considerable elevation above the stream and the water therefor is pumped by a turbine with a lift of 101.2 feet.

The state engineer made substantially the following award:

Claimant, Cline Falls Power company, claims a right from the direct flow of Deschutes river for power and irrigation purposes. The priority claim is February 2, 1892, based upon a notice of appropriation filed on that date, and upon construction work alleged to have been done subsequent thereto. Very little evidence was submitted showing the early history of this appro-

priation and the work done thereunder, but as no contest was made against the priority claimed, the right will be allowed as of that date. A right is claimed for the irrigation of 800 acres of land, less than half of which has been irrigated. This land lies at considerable elevation above the stream, and the water therefor is pumped by turbine with a lift of 101.2. The maximum quantity of water which has been so diverted, 14.17 second feet, it appears, will be ample for all the lands, and said quantity is hereby fixed as the maximum limit of the appropriation for irrigation use. As this right, however, is not perfected, claimant is allowed until October 1, 1933, or such further time as may be granted by the state engineer on good cause shown, in which to place the remainder of the land under irrigation. The right shall be limited to the acreage reclaimed and irrigated within said time. The water diverted from the stream under this right shall also be limited to one-fortieth of a second foot per acre, and to 4 feet per acre during any irrigation season, based upon the acreage actually under irrigation. It appears that the quantity of water necessary to operate the irrigation turbine, and which is hereby allowed for such purpose, is 90 second feet. The use of water under this right shall be confined to the irrigation season, as fixed herein.

Claimant has also used water at the same location for power for generating electricity which is transmitted to and used for commercial purposes in the towns of Redmond, Prineville, Madras and Culver, under lease to C. S. Sivyer, as an auxiliary to the plant of the Deschutes Power company on Crooked river. The quantity of water used for this purpose is 90 second feet. Claimant is allowed a right for that amount, which right shall continue throughout the year.

The state engineer states that the demands of the Cline Falls Power company require 180 second feet of water for power purposes, 14.17 second feet for irrigation purposes and 10 second feet for fish ladder or a total of 204.17 second feet with a fall of 28 feet. It has developed 795 horse power to the plant; that it requires 172.6 theoretical horse power to lift 14.17 second feet of water against the head of 101.2 feet plus 6 feet for friction and with an allowance of 60 per cent efficiency, which requires 287 theoretical horse power to run the pumps and, furthermore, that applying an actual efficiency of 70 per cent for the generator, it will take 287 additional theoretical horse power, or a total of 574 horse power to operate the plant now installed. And that it will require 180 second feet of water to furnish the power necessary to supply the 574 horse power.

The state engineer allowed the company 90 second feet of water for 12 months each year for the operation of the generator to create electrical power and 180 second feet for 6 months during the irrigation season for power to operate the pumps and create electrical power.

The circuit court awarded claimant 14.17 feet of water for irrigation and denied the company the right to use the 90 second feet for power purposes in opera-ating the pump.

■ It is contended by some of the appellants and respondents that the use of water by the Cline Falls Power company and the Odin Falls Land company for lifting water for irrigation and generating electricity to be used as power for lifting water for irrigation, is a waste of water.

In considering this question it should be noted that at the northern limits of Bend where the North canal

dam is located is the last point where it is feasible to divert water from the Deschutes river by gravity flow for irrigation. Several miles north of that point and about 2½ miles south and above Cline Falls, the city of Redmond, which has a junior claim to water, built a diversion dam and constructed about 1½ miles of expensive flume and diverted water into the flume to a turbine where power is developed to lift a comparatively small amount of water, about 375 second feet, into the city's reservoir from whence the water is conducted by a pipe line to the city, a place of about 1,500 inhabitants. Its water system cost over $100,000, bonds for which are now outstanding. The city also has a pump at the same location, the power for which is purchased from the local power company.

The pump operated by a turbine is an auxiliary plant and is used in cases of emergency. The part of the water which is used to raise the other water, is immediately returned to the river and flows down to Cline Falls where it is again used to develop power to raise water and again returned to the river where it flows down to Odin Falls and the Odin Falls Land company again diverts it and again uses it to develop power and again returns the major portion to the river where it can be used for other power development if desired. The city's appropriation was initiated subsequent to 1919, and after practically all of the rights on the Deschutes river. The use of the water by the city, however, should be taken into consideration in considering the matter of loss.

The average loss of water used for irrigation from dirt canals and lateral ditches is estimated in the books at 50 per cent. The loss by the Central Oregon Irrigation district by evaporation and seepage is estimated

herein at 40 per cent. Let us take the latter figures. Three uses can be made for practically all of the water in controversy used for power purposes by the city of Redmond, Cline Falls Power company and the Odin Falls Land company which, if compared with the loss in the Central Oregon Irrigation district, would be 120 per cent.

If it be waste to use water power to lift water, then it would necessarily be a waste to use electrical power generated by the use of water to raise water. There is necessarily a small loss in generating electrical power with water.

If an appropriation of water is made and applied for power purposes, which power is of the monthly value of $50, and another power plant which would be of a monthly value of $450, both would be for a beneficial purpose and the right to use the water could not be determined by the value of the use or power of the different plants. This is practically the question we have for consideration. Cline Falls Power company has a head of 28 feet. This is where the pinch comes. At the falls of the Willamette river at Oregon City, a magnificent power site, the average head utilized is said to be about 30 feet.

Argument is made that the appropriation of the Cline Falls Power company was made without a notice of appropriation posted. This overlooks the abstract and proof of this claimant which shows inter alia thus:

"Q. How was such right initiated, or upon what is it based? A. Notice of appropriation and subsequent use.

"Q. State the date of the initiation of such water right.

"A. 1892.

"Q. What steps were taken by this claimant or his predecessor in interest to initiate said right? Answer fully, attaching separate sheet if necessary.

"A. By posting notice at the proposed point of diversion and recording same with the county clerk of Crook county, a copy of which is hereto attached marked exhibit 'A,' and the construction of a canal for the diversion of the water."

The exhibit shows a notice of appropriation dated January 28, 1892, and filed February 2, 1892, by "Falls Irrigation Canal" the predecessor in interest of claimant.

It is also suggested that the Cline Falls Power company can purchase its power from an electrical power company without wasting a single drop of water. This is not a criterion. The difference in cheapness of the electric power, if that is what is meant, probably lies in the fact that one power company has a greater head of water than the other. See *In re Water Rights of Hood River,* 114 Or. 112 (227 P. 1065); *Low v. Schaffer,* 24 Or. 239 (33 P. 678); Wiel on Water Rights, p. 390, § 364 (3d Ed.).

The appropriation made by this claimant was for a beneficial purpose. We adopt the findings of the state engineer as to this claimant as above set forth.

### In Re Claim of Deschutes Reclamation and Irrigation Company

The petition of this claimant with much detail shows an error in listing the lands of claimant by the state engineer and in the modified decree of the circuit court:

That in the decree entered by the state engineer and also in the modified decree of said circuit court,

the rights of this petitioner in and to the waters of said stream were granted as inchoate when, as a matter of fact, it was intended in said original and in said modified decree to grant a vested right to the use of said waters appurtenant to the lands described under question 18 and to grant an inchoate right to any additional lands described and set forth in exhibit "D" and "E" attached to said statement and proof of claim.

That the state engineer in attaching to said decree a list of the lands for which a water right from said stream was granted, through error, inadvertence and mistake, incorporated therein only the lands described under question 18 of said statement and proof of claim, and through error, inadvertence and mistake failed to incorporate in said lists of lands the additional lands set forth and described in exhibit "D" and "E" attached to said statement and proof of claim.

For the purpose of making such corrections this claim is referred to the circuit court with authority to make the correction together with the assistance of the state engineer, so as to properly define this claimant's rights and that the list of lands of this claimant described in exhibits "D" and "E" attached to and made a part of the statement and proof of claim of the claimant, Deschutes Reclamation and Irrigation company, be incorporated in and made a part of the final decree herein.

### Appeal of Columbia-Deschutes Power Company

On the 7th day of January, 1924, the claimant, Columbia-Deschutes Power company, filed with the state engineer of Oregon its statement and proof of claim in this proceeding, setting forth its claim to the waters of Deschutes river for power purposes.

Claimant is a corporation organized and existing under and by virtue of the laws of the state of Nevada relating to the formation of private corporations, and has its principal office and place of business in Carson City in said state. It has power and authority, under its articles of incorporation, among other things, to engage in and conduct the business of generating, manufacturing, transmitting, distributing, selling and otherwise disposing of electricity to be used for light, heat, power and other purposes.

· Claimant has filed the documents and paid the fees, and met all the requirements of the laws of the state of Oregon, to entitle the plaintiff as a foreign corporation to do business in the state of Oregon. Claimant has paid to the state engineer, under the statute, fees for 130,000 horse power, $2,771, including $1 for certificate of right.

Claimant is the owner in fee simple of and in possession of land bordering on the Deschutes river for a distance of about 10½ miles in the counties of Wasco and Sherman, state of Oregon, which lands are fully described in claimants statement and proof of claim. The land comprises the banks and bed of said stream for approximately 7.25 miles of the distance traversed by said stream between the place where it enters on said lands and the most westerly and southerly of the lands to the place where the stream leaves the most easterly or northeasterly of said lands in the course of its flow, as shown by the maps filed herein.

The Deschutes river has a fall between the point where it enters claimant's property at the southwesterly end and where it leaves the property at the northerly end of approximately 140 feet.

At the time of the commencement of these proceedings this company was the owner of lands riparian to

the Deschutes river at the proposed dam site and covering in the aggregate many miles of the course of the river; and has since acquired the lands which were at that time owned by the late Malcolm A. Moody interspersed with this claimant's lands, so that at the time the case was submitted to the circuit court, claimant owned the lands from the mouth of the Deschutes river and covering the course of the river for some 10 miles upstream within which distance, as shown by the maps and evidence filed, there are at least two valuable power sites.

All contests by said claimant against other claimants on the river were adjusted by stipulations or disposed of by waivers filed; and all contests brought against said claimant were likewise disposed of by stipulations. A summary of these stipulations and waivers is that all differences between this claimant and any other claimants to the stream, are thereby adjusted. The stipulations and waivers are as follows:

"Whereas sundry contests and conflicting claims are now pending in the above entitled proceedings between Deschutes Falls Power company and Columbia-Deschutes Power company, each asserting rights to the flow of said stream at locations on the lower portion thereof, who are hereafter designated as the lower claimants on the one part, and North Canal company, Walker Basin Irrigation company, Crook County Improvement district No. 1, Central Oregon Irrigation district, Deschutes Reclamation & Irrigation company, Odin Falls Land company, Suttle Lake Irrigation district, Powell Butte Irrigation district, Jefferson Water Conservancy district, South Unit Improvement district, West Side Reclamation district, Deschutes County Municipal Improvement district, and Ochoco Irrigation district, each asserting rights to portions of the flow of said stream or some of its tributaries at points of diversion above the mouth of Crooked river,

hereinafter designated as the upper claimants, on the other part; and the said parties desiring to adjust and settle amicably their several conflicting claims and contests:

Now, therefore, this witnesseth, that it is stipulated and agreed by and between said lower claimants on the one part, each stipulating in respect to each several contest or conflicting claim in which it respectively is involved as against any of the upper claimants, and the said upper claimants, each likewise stipulating in respect to each several contest or conflicting claim in which it respectively is involved as against either of the lower claimants as follows, to wit:

''1. The lower claimants waive and relinquish as between themselves respectively and the respective upper claimants, all claims made herein by the lower claimants to the extent that the same are in conflict with the claims made by the upper claimants to the use of the natural flow (apart from storage) of the said Deschutes river or any of its tributaries; and the said lower claimants hereby consent that the said respective claims of the upper claimants as filed herein to the use of the natural flow of the said stream may be allowed.

''2. The lower claimants consent that storage rights and privileges prior and superior to any rights of the lower claimants, or either of them, may be allowed, awarded and decreed to the respective upper claimants seeking or asserting the same, but not to exceed the limits herein specified, and such upper claimants so claiming such storage rights and privileges consent, subject, however, to the reservation of paragraph seven hereof, that the water taken and stored shall be limited to the said amounts, to wit:
\* \* \*''

(Here follows stipulations as to the amounts of water to be stored by seven of the claimants.)

''3. In consideration of the concessions above made by the lower claimants, the upper claimants consent that the claim of the Deschutes Falls Power company under the alleged appropriations of its predecessors

in title, may be allowed, subject to the prior rights to the natural flow of the upper river and to storage rights in favor of the upper claimants as the same may be decreed in these proceedings pursuant to the above stipulations.

\*　　\*　　\*　　\*　　\*

"6. All pending contests brought by either of the lower claimants against any of the upper claimants and all pending contests brought by any of the upper claimants against either of the lower claimants shall be forthwith dismissed.

\*　　\*　　\*　　\*　　\*

"In witness whereof, the said parties have caused this stipulation to be signed by their respective attorneys or agents thereto duly authorized, this 15th day of April, 1925.

"DESCHUTES FALLS POWER COMPANY,
"By Veazie & Veazie."

This stipulation is signed by the various claimants mentioned in the stipulation. Other stipulations and waivers were made and filed adjusting all contests between this company and other claimants on the river as stated in the company's brief.

Malcolm A. Moody, during his lifetime, filed three claims in these proceedings as follows:

One for two second feet of water for irrigation for the irrigation of the 126 acres of land listed in his statement and proof of claim, and .25 second foot for domestic use and 200 second feet for operating a water wheel. In his statement and proof of claim it is shown that the water was actually diverted and used for irrigation purposes and domestic purposes about 1860. Water was first diverted by means of ditches on either side of the river, later by means of water wheels, flumes and ditches.

And a claim for 3,500 second feet of water for power development at Rimrock Power development

No. 1, where a 60-foot fall, or 23,863 theoretical horse power, can be obtained, and a 60-foot concrete or masonry dam is proposed. The proof states that he is the owner of the land bordering on the river and his right is based upon posting notices at proposed points of diversion and was initiated by posting notice January 18, 1906, on the riparian lands and filed the same with the county clerk and recorded in the office of the state engineer and thereafter other supplementary amendatory and additional notices were posted and recorded in the county clerk's office.

In 1907 a dam was designed 160 feet in height. In 1909 the design of the dam was adjusted to meet the requirements of the railroad and a new design of the dam was prepared on a basis of 140 feet in height and in 1910 the 140-foot dam was redesigned. Claimant Moody had prolonged negotiations with railroads resulting in both railroads so placing their tracks as to permit the development of this power site, to obviate excessive costs of moving the railroad. Surveys were made and maps were prepared showing the location of the stream, contour lines and other information. The map was later amended to meet conditions arising out of an adverse decision of the courts relative to the ownership of certain lands upon which plaintiff had contemplated locating a part of the dam. Certified copies of notices are attached to the proofs.

The other claim was for 3,500 second feet of water for power development at Rimrock Power development No. 2 which is called the lower site. This right was initiated by notices of appropriation posted. Plans were prepared and construction work commenced in 1908 and diligently pursued in promoting and securing the development of these two power plants. At this project a 43-foot fall, or 17,102 theoretical horse power

is available. These claims were located on the lower part of the Deschutes river and the water for power development was all to be returned to the river upon Moody's land.

Since the commencement of these proceedings the three several rights of Moody and his lands bordering on the Deschutes river, together with all the rights and privileges thereto pertaining have been acquired by the claimant, Columbia Deschutes Power company, as stated above.

These power sites are located upon the Deschutes river at ideal places for power plants. By virtue of the stipulations and waivers filed in this proceeding and set forth in full in the decree of the trial court, there is no conflict between the right claimed by this company and any of the other claimants on this river system adjudicated in this proceeding. The undertaking is an immense one and will necessarily take a long time for its completion. No objection thereto is made by any other claimant herein. The state engineer made findings and an order of determination in respect to this claim disallowing the same. Exceptions to such findings were filed in the circuit court and the circuit court, deeming it purely a claim of riparian right, that is, a claim for the full flow of the river passed the riparian lands undiminished in quantity and unpoluted in quality, disallowed the claim.

The Columbia Deschutes Power company claims the right to use and appropriate 8,000 cubic feet per second of the water of Deschutes river in the development of hydro-electric power and asserts that amount of water is necessary to this claimant in the development of such power project and asks that its right be recognized "protected and declared to be valid up to the extent of 8,000 cubic feet per second of the flow of said stream"

for the purpose of using the waters of said stream in the development on, and in connection with, its lands of hydro-electric power; subject, however, to the rights of all of the other adverse claimants to the use of the water from the Deschutes river according to the stipulations and waivers above mentioned. The water code of the state recognizes and protects appropriations of water for power purposes as well as for other beneficial purposes.

The Columbia Deschutes Power company in its brief in form denominates its claim as "a riparian right to use the waters of the Deschutes river." In substance and effect it is a claim to the use of water or an appropriation. The claimant asks for a decree of a specific quantity of water for use in the future. As stated by Mr. Justice BURNETT in *Caviness v. La Grande Irrigation Co.*, 60 Or. 410 at 421 et seq. (119 P. 731):

"An appropriator, subject to rights in existence at the time his appropriation is made, may take all the water he can use reasonably and without waste for a beneficial project, although it may be the lion's share and none may be left for those who come afterwards. In other words, a riparian owner, using water in that capacity, is in a sense always a tenant in common with other riparian owners on the same stream whose rights, at least for irrigation, he is bound not materially to injure by his riparian use of the water. The appropriator, however, is always a tenant in severalty owing no duty or respect to those endeavoring to use the water by title subsequent to his own. * * *

"*In the very nature of things, a court cannot fix in advance by its decree what quantity of water will be reasonable in the future for the use of a riparian proprietor claiming the duty of water in that character.* This conclusion is a necessary corollary to the case of *Jones v. Conn*, 39 Or. 30 (64 P. 855, 65 P. 1068, 54 L. R. A. 630; 87 Am. St. Rep. 634).

"Concerning the mere diversion and use of water there is no difference between a nonriparian appropriator and a riparian user, provided the former has a lawful right of access for that purpose to the stream from which the diversion is made." (Italics ours.)

■ This is an equity proceeding and the court should look at the substance of the matter rather than the form. It appears from the record that this claimant and its predecessors in interest have done a vast amount of work looking to, and necessary for, the construction of a power plant for the development of hydro-electric power, in engineering and designing and preparing sites, expending for such purposes not less than $2,400, and through an arrangement of the claimant and its predecessors with the railroad company in 1909, about $300,000 has been expended so as to protect and preserve the sites for such plant.

The railroad companies were compensated, as we understand the record, by claimant and its predecessors in making conveyances of rights of way for the railroads. The claimant has succeeded to the right of M. A. Moody who filed a notice of appropriation and attempted to make an appropriation of a considerable quantity of water.

The purpose of a notice of appropriation of water is that when the claimant has diligently prosecuted his work, his right, on its completion, may relate back to the beginning of it and to inform other appropriators: I Wiel on Water Rights, § 368, p. 399 (3d Ed.). The matter of relation, as we view it, has been rendered unimportant by virtue of the stipulations and waivers filed herein, practically making the date of appropriation immaterial. It is said an appropriation, under the old system, may be made by a completed actual diversion for a beneficial purpose without following the

statutes, or else by proceeding under the statute. The difference is, that by conforming to the statutory method the appropriator can claim the benefit of the doctrine of relation, while in the former case he cannot. This difference existed from the earliest times and the statute merely fixed the details of the method by which an appropriator could secure the benefit of the doctrine of relation: I Wiel (3d Ed.), § 364, p. 390.

Flowage rights and easements on other lands in private ownership have been purchased by these parties for the purpose of completing said power project at an expense of at least $23,500. This has been done in good faith with a view to the construction of a power plant.

After all that has been accomplished by the claimant, its rights should not be left unprotected in this proceeding. Certainly the work done by claimant and its predecessors is just as essential (and it consisted of the things that should first be done) as actual construction work on the plant and should be so considered. The way is practically paved for a stipulated decree for claimant. No adverse interest will be affected by granting claimant the right to use the water claimed.

After claimant has proceeded thus far with the proposed undertaking and expended large sums of money in so doing, a later promoter or appropriator should not be permitted to intrench upon claimant's rights. Construction of the power plants will naturally depend on the demand for electric current.

The rule applied in this proceeding, as stated in the order of determination, is as follows:

"The elements essential to a valid appropriation of water, under the doctrine as so established, are well

known, having been clearly defined by many court decisions. And as an accompaniment thereto, the doctrine of relation was utilized where applicable, enabling the water right to relate back for priority to the time when the first step which would constitute constructive notice to others of the intended appropriation, was taken by the appropriator, providing reasonable diligence was exercised in perfecting the appropriation. The first step taken might consist of the posting and recording of a notice, as had become more or less customary following the practice of the early miners, or the commencement of construction work or of surveys preliminary thereto. Any such act, however, to invoke the doctrine of relation, must be such as to apprise others of the proposed appropriation so that they were bound to take notice thereof.''

In the decree as to the Deschutes Falls Power company, we find the following provision:

''And provided further that the said Deschutes Falls Power company, within one year from the date when the decree in its favor herein becomes final as above provided, shall apply to the federal power commission for such licenses or permit from said federal power commission as it may be necessary for said company to obtain in order to construct said project; and that the time of beginning of construction of the project and of the completion thereof shall be such as may be fixed by said federal power commission by its permits and its orders made in connection therewith; but in case it shall turn out that a federal power permit is not necessary to said project, and such application therefor is not made within one year as above provided, then said Deschutes Falls Power company, its successors or assigns, shall apply to the court within said one year period to fix the time for beginning and completion of construction of said project.''

This appears satisfactory to the Deschutes Falls Power company as no appeal therefrom has been taken.

In other parts of the decree it seems that the state engineer and the federal power commission are working in harmony in relation to these different power companies. A similar provision in regard to Columbia Deschutes Power company will no doubt be beneficial.

41. The Columbia Deschutes Power company is entitled to a decree allowing it an award to use 8,000 cubic feet per second of water from the Deschutes river for power purposes to be used on its lands, or so much thereof as may be necessary and beneficial, with a date of relative priority of January 5, 1924, the date of making this claim, used for the operation of such power plant.

This claim is subject to the rights and claims of all the other water users upon the Deschutes river, a part of them being known in the record as the upper claimant, according to the stipulations and waivers made by this claimant between it and the other claimants and set forth in full in the decree of the circuit court.

The rights of this claimant are also subject to the payment of such license fees as may be due under the statute of Oregon. Provided, further, that the said Columbia Deschutes Power company shall apply to the federal power commission for such license or permit from said federal power commission as may be necessary for said company to obtain in order to construct said project and that the time of beginning of construction of the power plant of claimant and of the completion thereof, shall be such as may be fixed by said federal power commission by its permits and its order made in connection therewith and in conjunction with the state engineer to the approval of the circuit court; or in the event that no such action is taken by the federal power commission, or the state engineer, then the

Columbia Deschutes Power company shall apply to the circuit court to fix the time for beginning and completion of the construction of said project.

## DUTY OF WATER

The decree herein rendered and authorized to be rendered by the circuit court is not a final determination of the duty of the water for irrigation pertaining to the determination of the rights involved in these proceedings.

Several of the claimants have requested the court to refer the question of the duty of water, which to a certain extent involves the matter of loss by evaporation, seepage and other ways, to the circuit court and through the circuit court to the state engineer.

In order that further study may be made as to the amount of water necessary to be delivered on the land to produce fair results, the question of the duty of water will be so referred; the state engineer to report to the circuit court such findings, as he may see fit to make in regard to the matter, upon application made to the circuit court by any of the claimants within three months after the entry of the decree of the circuit court upon the mandate of this court; such report of the engineer to be filed with the circuit court within two years from the date of such decree of the circuit court.

The state engineer and the circuit court to have full authority to take further testimony, if so deemed necessary, regarding the duty of water for irrigation and to make any order of determination and decree on the sole subject of the duty of water for irrigation including the rate of diversion of water for irrigation at various seasons of the year by the several water users, as might be made upon an original hearing.

This reference is made so that the duty of water may be fixed in the light of the experience that has been had in the matter since the order of determination made by the state engineer and the decree of the circuit court and in order for further time for making tests and experiments, if it shall be deemed necessary.

The record in this case is voluminous, consisting of some thirty-five large volumes and many exhibits and it is quite likely that there may be an oversight in regard to some matters. By counsel calling attention to any such oversight herein and pointing out the issue, mentioning the volumes and pages of the testimony relating thereto, the matter will be dealt with in a supplemental opinion.

With the modifications and exceptions herein mentioned, the decree of the trial court is affirmed. Each party will be required to pay his or its own costs and disbursements herein.

Petition for rehearing denied December 30, 1930

ON PETITION FOR REHEARING
(294 P. 1049)

BEAN, J. In conformity with the statement in our former opinion that a supplemental opinion would be written in regard to matters that might be overlooked, or necessary corrections, we will take up the matter and endeavor to cover the questions contained in the motions for rehearing. Reference will be made to our former opinion.

APPEAL OF CENTRAL OREGON IRRIGATION DISTRICT

The decree of the circuit court fixing the irrigation season on the project of the Central Oregon Irrigation district, from April 1 to November 1 of each year and the period of maximum use, from May 23 to August 20, of each year, is affirmed, and the former opinion modified to conform herewith.

## WATER FOR DOMESTIC USE

The Central Oregon Irrigation district, by a petition for rehearing, urges that the restriction contained in the decree of the circuit court applying to that part of the opinion headed "Water for Domestic Use," which was affirmed by our former opinion, referring to the use of water for stock and domestic purposes on page 94 of the decree, as follows:

"It is further provided that diversions for these purposes by the above-named companies shall be under the supervision of the water master to the end that no two of them shall divert water for such purposes at the same time."

would inconvenience and perhaps prevent the use of water for such purposes in case of extreme necessity, and there being no objections made or known to the modification of such provision, the sentence which we have quoted from the circuit court's decree will be modified so as to eliminate therefrom the words "to the end that no two of them (referring to the companies and districts) shall divert water for such purposes at the same time," so the decree will provide for diversion of water during the nonirrigation season for stock and domestic purposes, as follows: It is further provided that diversions for these purposes (that is,

for stock and domestic use) by the above-named companies shall be under the supervision of the water master.

The petition of claimant requests that the relative date of priority of October 31, 1900, allowed the North Canal Company for fifteen cubic feet per second of time for 591 acres of land should be subsequent in time and inferior in right and subject to the rights awarded to the Central Oregon Irrigation district of said date, as provided in the "Deitrich Decree" which was referred to in the decree of the lower court and in our former memorandum, and the terms of which have been followed in the decree of the circuit court and in our former opinion and is practically agreed to by all the parties interested.

On the petition of the Central Oregon Irrigation district and the stipulation between claimant and the state engineer, an addition will be made to the first paragraph of our former opinion, under the heading "Water for Domestic Use," so such paragraph will read as follows:

The testimony shows that, owing to the volcanic nature of the lands embraced within the Central Oregon Irrigation district, the people living in that district cannot depend upon wells for their domestic and stock water, but must secure such water through their irrigation ditches; and that during the nonirrigation season freezing weather makes it necessary that this water be delivered in a rather large head to conduct the same to the concrete cisterns on the several farms, and a head of 400 second feet of water is required for such purpose. That amount, namely, 400 second feet, is hereby awarded for storage in cisterns for domestic and stock water for the people of the district, to be

diverted during the nonirrigation season; provided that the total amount diverted shall not exceed twenty-five thousand acre feet in any one year; provided, further, that in view of the fact that the Central Oregon Irrigation district and other irrigation projects require water for domestic use at the same time during the nonirrigation season, and in view of the weather conditions prevailing in the Deschutes basin during the winter months, it is necessary that all of the projects, requiring and having water adjudicated to them for domestic use, divert for domestic use at the same time. It is hereby ordered that the Central Oregon Irrigation district and other projects may divert for domestic use to the amount fixed in this decree simultaneously when necessary, in order to supply water for domestic needs. In other respects the provision of the decree of the circuit court for the allowance of water for domestic use and watering livestock, is affirmed.

CLAIM 15-Z OF THE NORTH CANAL COMPANY

The opinion will be modified by changing the first paragraph, so as to read as follows:

The decree will be modified by changing the date so as to give the North Canal Company a date of relative priority of October 31, 1900, for fifteen cubic feet per second of time for 591 acres of land; provided the right shall be inferior to the rights of the Crook County Improvement District No. 1, as provided in the contract between the district and the North Canal Company; and, provided further, that such right of the North Canal Company shall be inferior and subject to the rights of the Central Oregon Irrigation district, in accordance with the provisions of the Deitrich Decree and the contracts of the parties interested or their predecessors in interest.

## Maintenance Fees

A change is requested to be made in our former opinion relating to maintenance fees. We simply referred to the general rule for the only purpose of showing that the contracts for maintenance fees were not embraced within the appeal. We were urged to pass on the contract with one L. D. Wiest and declined to do so, and we are compelled to still decline to pass upon this question. It is not involved in or germane to this appeal. The general rule referred to was not intended to and does not affect any other contract or claim.

Except as above provided, the petition of the Central Oregon Irrigation district for rehearing is denied.

## Appeal of Cline Falls Power Company

An application is made for the substitution of E. M. Peck in lieu of claimants E. E. Goucher and Cline Falls Power Company in this proceeding and that George H. Brewster be substituted as attorney of record in this proceeding for Jay H. Upton, Percy Cupper and A. C. Shaw in representing the interests listed and allotted to the Cline Falls Power Company and E. E. Goucher. The substitution of the party is asked on account of an alleged transfer of interests formerly belonging to the Cline Falls Power Company, which is said to have been made since the former opinion was written. Such substitution is unnecessary. Oregon Code 1930, § 1-311 (Or. L., § 38), provides, in substance, that no action shall abate by the transfer of any interest therein. This section is made applicable by Oregon Code 1930, § 6-107 (Or. L., § 395), to suits in equity, which are followed in the proceedings adjudicating water rights under the statute: *Culver v. Randle,* 45 Or. 491 (78 P. 394); *Meyers v. Hot Lake Sana-*

*torium,* 82 Or. 587 (161 P. 697). All of the provisions of the decree herein will inure to the benefit of the grantee or transferee, the Cline Falls Power Company, if any.

As to the substitution of attorneys, should any question arise, Mr. Brewster, representing an interested party, will be recognized as attorney. Should there be any conflict or controversy between the attorneys who formerly represented Cline Falls Power Company and counsel who represent the present owner of the project, the court will give the matter due consideration. The application for substitution of E. M. Peck will be denied.

A petition for rehearing and brief in support thereof on behalf of Cline Falls Power Company asking that 180 second feet instead of 90 second feet be awarded the Cline Falls Power Company during the entire year for power purposes has been filed. After a consideration of the testimony relating to such claim, the petition for rehearing is denied.

APPEAL OF COLUMBIA-DESCHUTES POWER COMPANY

Taking up the petition of this claimant for a rehearing, supported by an extended and forceful brief, we note that claimant restates its claim and asks to be protected in its right to the full amount of 8,000 cubic feet per second of time of the waters of Deschutes river. That amount was awarded to this claimant from the river for power purposes to be used on its lands or so much thereof as may be necessary and beneficial, with a date of relative priority of January 5, 1924. This power company having stipulated and waived its right in favor of all claimants and appropriators on the river above the proposed location of its power plant, we do not understand that the date of its prior-

ity is objected to. The claimants' rights should be protected. The only way under our statute that its rights can be protected is by giving it superiority over subsequent rights, initiated after the right of the power company. When the law-makers of the state adopted the water code and directed the procedure for adjudicating the waters of stream systems, they provided for the manner of adjudication as followed in this case and in several others. The method pointed out by the statute has been follewed without question in regard to all the claimants in this proceeding. As we have heretofore indicated, a definite quantity of water can be adjudicated in favor of claimant only under the statute by following the method mapped out by the state law. We quote from the opinion of Mr. Justice BURNETT in the case of *Caviness v. La Grande Irrig. Co.,* 60 Or. 410, at page 421 (119 P. 731):

"In the very nature of things, a court cannot fix in advance by its decree what quantity of water will be reasonable in the future for the use of a riparian proprietor claiming the duty of water in that character."

Where the old riparian right system prevails, a riparian owner using water in that capacity is, in effect, always a tenant in common with other riparian owners on the same stream, and the amount to which such riparian owner is entitled varies with the reasonable demands of the other riparian proprietors. In other words, it is not a right to a definite amount of water while an appropriator is always a tenant in severalty and a decree can be rendered under the statute recognizing the righ᠎ of an appropriator for a definite amount of water. This is forcefully illustrated by the brief on rehearing of learned counsel for this claimant, from which we quote: "in the original claim filed with the state engineer, the limit of quantity of which the

claimant considers that it can make any beneficial use, and for which it is therefore willing to pay fees, is specified." And on the following page, referring to the claim made to the state engineer, when these proceedings were commenced, following the forms provided for appropriators which "require the amount claimed to be specified. In the next place a claim which did not specify its amount would be no claim at all." It might be further stated that a decree without specifying an amount would be no decree at all. Counsel in their brief suggests:

"Furthermore, the law requires (§ 5737) that at the time of taking testimony for the determination of rights to water, certain fees shall be paid, including, in case of claims to power, so much for each horsepower claimed,"

and asks:

"How is this to be computed, if no quantity is specified? Upon the final determination of the rights, it is provided by § 5744 that a certificate shall be issued, setting forth, among other things, the 'priority of the date, extent, and purpose of the right.' "

And they ask:

"How is the extent to be specified if no quantity may be mentioned, defined or limited in any wise at any stage of the proceedings, without forfeiting the right?"

The only answer that we think of to this question is that the quantity of water to which the claimant is entitled under the date of relative priority and the purpose for which it is intended to be used, should be specified as it has been specified in our former memorandum, and no doubt will be, when the time arrives, specified in the certificate of the state engineer, pursuant to the decree of this court. Therefore, as hereto-

fore mentioned, we concluded that the claim of this power company was, in substance, that of an appropriator. We still adhere to that opinion.

In passing upon this question there is not the remotest inclination to criticize counsel in any way, as the writer, when at circuit, attempted to do the very thing that counsel is now asking, namely, to award to a riparian proprietor a definite quantity of water. The case, upon reaching this court after the writer hereof was a member of this court, was promptly reversed. We refer to the case of *Caviness v. La Grand Irrig. Co.,* supra.

■ The statute recognizes no difference as to the right of water to be used for irrigation from water to be used for power purposes, in so far as it relates to the protection of such rights. Both such uses should be and are protected under the statute. The rights of this claimant, which has stipulated liberally in regard to the rights of other appropriators, we think will be fully protected by a decree entered in accordance with our opinion.

■ Reference is made to the statement and proof of claim of the Columbia-Deschutes Power Company, which is in the nature of both a pleading and evidence. Under the statute these proceedings are conducted as nearly as may be in conformity to a suit in equity. In the case of *Hough v. Porter,* 51 Or. 318 (95 P. 732, 98 P. 1083, 102 P. 728), it was said by Mr. Commissioner King, in effect, that the water suits are *sui generis* and an equitable rule should be adopted.

Counsel in their brief suggest that there is no occasion for an application to be made for a federal permit relating to the construction of the project of this claimant. Therefore the last paragraph of the

opinion relating to the appeal of the Columbia-Deschutes Power Company, will be modified by striking out the provision relating to such application, so that the paragraph will read as follows:

The rights of this claimant are also subject to the payment of such license fees as may be due under the statute of Oregon. The further construction and completion of the power plant or plants of the Columbia-Deschutes Power Company may be commenced, prosecuted and consummated as authorized by the statutes of Oregon or granted by the state engineer of the state of Oregon pursuant to law.

## Duty of Water

The duty of water for Deschutes river irrigation still remains for final determination, as indicated in our former opinion.

With the modifications above-mentioned, the petitions for rehearing are denied.